**THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION FOR USE IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OF REORGANIZATION DESCRIBED HEREIN.  ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT ARE NOT INTENDED AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED HEREIN BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION.**

George B. Hofmann (10005)
Matthew M. Boley (8536)
Steven C. Strong (6340)
**Parsons Kinghorn Harris**
A Professional Corporation
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
Telephone: (801) 363-4300
Facsimile: (801) 363-4378

Proposed Attorneys for Debtors-in-Possession
HRAF Holdings, LLC and Harbor Real Asset Fund, LP

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re<br><br>HRAF HOLDINGS, LLC, and<br>HARBOR REAL ASSET FUND, LP,<br><br>Debtors. | Bankruptcy No. 10-32433 (RKM)<br>Bankruptcy No. 10-32436 (RKM)<br><br>[Chapter 11]<br><br>[Filed Electronically] |

## DISCLOSURE STATEMENT WITH RESPECT TO PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

September 9, 2010

**IMPORTANT**

**THIS DISCLOSURE STATEMENT IS SUBMITTED TO ALL CREDITORS OF HRAF HOLDINGS, LLC AND HARBOR REAL ASSET FUND, LP ENTITLED TO VOTE ON THE PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE HEREIN DESCRIBED, AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO ACCEPT OR REJECT THE PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE AS TO THE PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. ALL CREDITORS AND INTEREST HOLDERS ARE URGED TO READ THE DISCLOSURE STATEMENT AND ATTACHMENTS WITH CARE AND IN THEIR ENTIRETY.**

**ON [OCTOBER 28, 2010], THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE. SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE HEREIN DESCRIBED AND ATTACHED AS EXHIBIT A, IS BEING SOUGHT FROM CREDITORS AND INTEREST HOLDERS WHOSE CLAIMS AGAINST, AND INTERESTS IN THE DEBTORS, HRAF HOLDINGS, LLC AND HARBOR REAL ASSET FUND, LP, ARE IMPAIRED UNDER THE PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. CREDITORS AND INTEREST HOLDERS ENTITLED TO VOTE ON THE PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE ARE URGED TO VOTE IN FAVOR OF THE PLAN AND TO RETURN THE BALLOT INCLUDED WITH THIS DISCLOSURE STATEMENT UPON COMPLETION IN THE ENVELOPE PROVIDED.**

1.

**PRELIMINARY STATEMENTS**

### 1.1.    General Information Concerning Disclosure Statement and Plan

HRAF Holdings, LLC and Harbor Real Asset Fund, LP debtors and debtors-in-possession in the above-captioned case (the "Debtors"), submit this Disclosure Statement under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016. The purpose of this Disclosure Statement is to disclose information adequate to enable creditors who are entitled to vote to arrive at a reasonably informed decision in exercising their rights to vote on the Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Plan"). A copy of the Plan is attached as Exhibit A. Capitalized terms used but not defined in this Disclosure Statement shall have the meanings assigned to them in Article I of the Plan or in the Bankruptcy Code and Bankruptcy Rules. All section references in this Disclosure Statement are to the Bankruptcy Code unless otherwise indicated.

The Debtors have promulgated the Plan consistent with the provisions of the Bankruptcy Code. The purpose of the Plan is to provide for payment in full to each Class of Claims in a reasonable time. The Debtors believe that the Plan permits the maximum recovery for all Classes of Claims.

This Disclosure Statement is not intended to replace a careful review and analysis of the Plan, including the specific treatment of Claims under the Plan. It is submitted as an aid and supplement to your review of the Plan to explain the terms of the Plan. Every effort has been made to explain fully various aspects of the Plan as they affect creditors. If any questions arise, the Debtors urge you to contact its counsel to attempt to resolve your questions. You may, of course, wish to consult with your own counsel.

## 1.2.    Disclaimers

NO SOLICITATION OF VOTES HAS BEEN OR MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND SECTION 1125 OF THE BANKRUPTCY CODE, AND NO PERSON HAS BEEN AUTHORIZED TO USE ANY INFORMATION CONCERNING THE DEBTORS TO SOLICIT ACCEPTANCES OR REJECTIONS OF THE PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. CREDITORS SHOULD NOT RELY ON ANY INFORMATION RELATING TO THE DEBTORS OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED.

EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, NO REPRESENTATION CONCERNING THE DEBTORS, THEIR ASSETS, PAST OPERATIONS, OR CONCERNING THE PLAN IS AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN. ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS.

UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF. NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE CONCERNING THE DISCLOSURE STATEMENT AND THE PLAN SHALL UNDER ANY CIRCUMSTANCES IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

WHILE THE INFORMATION PROVIDED HEREIN IS BELIEVED RELIABLE, THE DEBTORS HAVE NOT UNDERTAKEN TO VERIFY OR INVESTIGATE SUCH INFORMATION, AND MAKES NO REPRESENTATION AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION.

DISTRIBUTION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS ANY REPRESENTATION OR WARRANTY AT ALL, EITHER EXPRESS OR IMPLIED, BY THE DEBTORS OR THEIR PROFESSIONAL CONSULTANTS, THAT THE PLAN IS FREE FROM RISK, THAT THE ACCEPTANCE OF THE PLAN WILL RESULT IN A RISK-FREE RESTRUCTURING OF THE DEBTORS' OBLIGATIONS OR THAT THE OBLIGATIONS OF THE DEBTORS AS RESTRUCTURED BY THE PLAN WILL BE FULLY PERFORMED IN THE FUTURE WITHOUT RISK OF FURTHER DEFAULT.

THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE

**PLAN OR A GUARANTEE OF THE ACCURACY OR THE COMPLETENESS OF THE
INFORMATION CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT AND THE PLAN ATTACHED SHOULD BE READ IN
THEIR ENTIRETY BEFORE VOTING ON THE PLAN. FOR THE CONVENIENCE OF
HOLDERS OF CLAIMS, THE TERMS OF THE PLAN ARE SUMMARIZED IN THIS
DISCLOSURE STATEMENT, BUT ALL SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY
BY THE PLAN, WHICH CONTROLS IN CASE OF ANY INCONSISTENCY.**

## 2.

### BRIEF SUMMARY OF THE PLAN

Harbor Real Asset Fund, LP ("Harbor") was formed in 2003 as a private realty capital
fund that invested in short-term, real estate-backed debt, sometimes referred to as bridge loans,
or hard money loans. Harbor's principals began operations in 1999 through Harbor's
predecessor. Harbor has always been primarily capitalized by equity contributions from its
limited partners. Harbor has more than 70 limited partners who collectively contributed more
than $40 million to the fund.

Harbor was a profitable business until mid-2008, when the present Great Recession
resulted in the inability of many of Harbor's borrowers to repay their loans, coupled with a
drastic decline in real estate values. The primary security for all of Harbor's loans was real
estate; and Harbor typically only invested where it would receive a first-priority trust deed or
mortgage on the underlying real estate. As a result, when Harbor's borrowers defaulted in
payment, Harbor foreclosed its trust deed positions. During 2008 and 2009, most of the notes
receivable on Harbor's balance sheet were gradually replaced by real estate through the
foreclosure process.

In an effort to provide additional liquidity to its operations, Harbor obtained a secured
credit line with Bank of America, N.A. (the "Bank") pursuant to a Credit Agreement dated
September 12, 2006 ("Credit Agreement"). Pursuant to Credit Agreement and the
accompanying documents, the Bank took a security interest in the Notes originated by Harbor.
On July 23, 2009 the Bank and Harbor entered into a Forbearance Agreement (the
"Forbearance Agreement"). Under the Forbearance Agreement, the Bank required Harbor to
transfer substantially all of its assets to a single-purpose subsidiary—HRAF Holdings, LLC
("HRAF") and the Bank took a security interest in Harbor's membership interest in HRAF. The
Bank is threatening to foreclose on its security interest, which would completely diminish the
rights of the other creditors and extinguish the equity of the limited partners.

Through the Plan, the Debtor propose to repay creditors in full with the proceeds of the
liquidation of its real estate portfolio. Contemporaneously with the filing of the Debtors'
bankruptcy petition, the Debtors have filed motions to approve the sale of real estate which will
result in net proceeds to the Bank of nearly $3.5 million. The Debtors propose to liquidate their
remaining real estate holdings in an orderly process designed to maximize returns to all
stakeholders. The Debtor will pay the Bank in full not less than two years after the Effective
Date of the Plan (this is defined in the Plan as the "Initial Sales Period"). Other secured
creditors (primarily real estate taxing authorities) will be paid in full not less than three years
after the Effective Date (this is defined in the Plan as the "Final Sales Period").

With respect to Holders of Unsecured Claims, the Debtors have proposed to immediately pay certain relatively small Claims (less than $3,000) 80% of the face amount of these Claims. Other Holders of Unsecured Claims will be paid in full under the Plan not later than the end of the Final Sales Period.

To facilitate and streamline this reorganization, the Debtors have proposed that their assets and liabilities be consolidated as provided under the Plan, such that the Debtors will emerge from bankruptcy as a single entity (defined in the Plan as the "Reorganized Debtor"). After creditors have been paid in full, the Reorganized Debtor will file a motion for entry of a final decree in the Bankruptcy Case, and will proceed to conduct its business of maximizing returns to its limited partners, free of any constraints of the bankruptcy process.

## 3.

## THE DEBTOR

### 3.1.    Pre-Petition Financing and Capital Structure

#### 3.1.1.    Harbor Partnership Interests

Harbor was organized in 2003 as a Delaware limited partnership. Its general partner is Harbor Capital Partners, LLC. Harbor has more than 70 limited partners, who collectively made capital contributions to Harbor in excess of $40 million.

#### 3.1.2.    HRAF Member Interest

Harbor is the sole member of HRAF.

#### 3.1.3.    Disputed Secured Debt Asserted by the Bank

The Bank asserts a claim against the Debtor of approximately $10.4 million. The primary security for the Bank's debt is Harbor's equity interest in HRAF. Harbor and the Bank entered into the Forbearance Agreement in 2009, which required Harbor to form HRAF as a single-purpose entity. Harbor was required to transfer substantially all of its assets to HRAF in return for a member interest in HRAF. Pursuant to the Forbearance Agreement and the accompanying Pledge and Security Agreement, the Bank acquired a security interest in Harbor's member interest in HRAF.

As part of the Forbearance Agreement, the Bank placed negative pledges on each of Harbor's real property assets, prohibiting the transfer of an asset without the consent of the Bank. During 2010, the Debtors attempted to liquidate their assets in a cooperative manner, however, the Bank refused to consent to sales of assets proposed by the Debtor and release its negative pledges. The Bank provided notice of a foreclosure sale of its security interest in HRAF, with the sale scheduled for September 10, 2010. The Bank refused to continue this sale to allow the Debtor to liquidate assets to make substantial payments to the Bank. As a result, the Debtor had no reasonable option but to file this case to preserve the value of its assets for stakeholders other than the Bank.

### 3.1.4. Other Secured Debt

Reynolds Brothers Construction holds a claim secured by a mechanic's lien on the Debtors' Dimple Dell real property. The Debtors have proposed to sell that property before confirmation of its Plan, which will result in the payment in full of the Reynolds Brothers Construction Secured Claim.

Other than the claims of Reynolds Brothers Construction, the holders of secured claims against the Debtors relate to either real property taxes or home owners association fees. Through the Plan the Debtors have proposed to repay in full all of these debts in not less than three years.

Mallorca Partners is an entity associated with Ryan Relyea, a Managing Director of Harbor. Although Harbor executed a security agreement in connection with this debt, the security interest was never perfected. Through the Plan, the Debtors have proposed to subordinate this debt to all other Claims against the Debtors.

### 3.1.5. Unsecured Debt

The Debtors' undisputed unsecured debts total less than $200,000. Clark Real Estate has asserted an unsecured Claim against Harbor in the approximate amount of $200,000, which Claim is disputed. High Country Roofing has asserted an unsecured Claim against Harbor in the amount of $90,000 which Claim is disputed. Salt Lake Sand and Gravel has asserted an unsecured Claim against Harbor in the approximate amount of $20,000 which claim is disputed.

### 3.1.6. Loan Participation Parties

Harbor originated some of its loans in cooperation with other lenders. Specifically, in four instances other lenders acquired an undivided interest in the loans. Thus, with respect to these participated loans, Harbor acts as agent in administering and enforcing the loan, but the Debtors are not entitled to all of the proceeds of the loan by virtue of the participation agreements. The Debtors do not believe that these loan participants are creditors of the Debtors, and the Debtors do not believe that they are entitled to the proceeds of the loans, in excess of the agreed participation percentages. By way of example, if Harbor entered into a participation agreement with another lender, with Harbor and the other lender each advancing half of the loan proceeds, and the borrower repaid $100, then Harbor would be entitled to $50 of the loan repayment, and the other lender would be entitled to the other $50.

Several of these loan participations involve Harbor Offshore Real Asset Fund, Ltd. ("Harbor Offshore"). Harbor Offshore is organized as a Cayman Islands exempted company for the purpose of enabling foreign (i.e. non-U.S. citizens) investors to participate in loans originated by Harbor. Harbor Offshore shares common management with the Debtors.

Harbor's loan participations are summarized below.

| Borrower/Loan | Participation Lender | Percentage |
|---|---|---|
| Strawberry Holdings- Cedar City | Interwest Industries, Inc. | 18% |
| | Tim Morris | 16% |
| | Bridge Loan Capital Fund, LP | 16% |
| All Valley Properties, L.L.C. | Harbor Offshore Real Asset Fund, Ltd. | 49.97% |
| Dimple Dell | Harbor Offshore Real Asset Fund, Ltd. | 35.00% |
| Pool – Vernal | Harbor Offshore Real Asset Fund, Ltd. | 72.38% |
| Sleepy Ridge | Harbor Offshore Real Asset Fund, Ltd. | 8.19% |
| Midway Capital/Powder Mt. | Harbor Offshore Real Asset Fund, Ltd. | 14.87% |
| Southgate Townhomes | Harbor Offshore Real Asset Fund, Ltd. | 44.56% |

### 3.2.    Events Leading to Bankruptcy

#### 3.2.1.  The Debtors' Business

Harbor, through its predecessor in interest, was formed in 1999 as a provider of short-term capital solutions to individuals and businesses with a strong motivation towards ultimate project success.  Harbor's allocation has historically consisted of real-estate backed debt where the collateral is located primarily in the United States.  Harbor established itself as a ready source of capital, funding hundreds of successful transactions totaling over $400 million.

Harbor's investment objective was to invest in a diversified portfolio of privately-originated, collateral-backed debt instruments.  Harbor originated short-term real estate secured loans with low loan-to-value ratios.  Every real estate loan was collateralized by a priority lien position and each loan was evidenced by a first-position trust deed or mortgage.

Harbor's objective was never to acquire real estate.  Instead, its goal was to be repaid by its borrowers.  Harbor was profitable as a result of its loan receipts until mid-2008.  Since that time, capital markets have all but vanished, exit capital was no longer available, and real estate values have plummeted.  In addition, Harbor's primary borrowers were real estate developers.  Many real estate developers fell into financial distress beginning in 2008, and as a result most of Harbor's borrowers were unable to repay their obligations to Harbor.

As Harbor's loans defaulted, Harbor took the necessary steps to gain control of the underlying collateral and, where prudent, enforce personal guarantees.  These actions have created a portfolio of real estate assets, actively managed by Harbor to maximize asset liquidation value.

Harbor's primary lender is the Bank.  The Bank claims to be owed at least $10.4 million.  Harbor was unable to make a required loan payment which came due December 31, 2008, and the Bank has alleged that Harbor committed subsequent defaults in its obligations.  In July 2009, Harbor and the Bank restructured the Bank's loan to Harbor through the Forbearance

Agreement in a manner which significantly improved the Bank's position.  As required by the Forbearance Agreement, substantially all of Harbor's assets were transferred to HRAF, and Harbor granted the Bank a security interest in Harbor's member interest in HRAF.

While the mechanism devised by the Bank appears calculated to ease the Bank's liquidation of the Debtors' real property portfolio and quickly repay the Bank in full, the Debtors must by necessity consider the interest of other creditors and stakeholders.  The Bank had scheduled a foreclosure sale of Harbor's interest in HRAF on September 10, 2010.  The Debtors commenced this case to ensure a commercially reasonable liquidation of its real estate assets for the benefit of all of its creditors and stakeholders.

### 3.2.2.  The Bankruptcy Filing

On September 9, 2010, the Debtors filed their voluntary petitions under Chapter 11 of the Bankruptcy Code.

### 4.

### THE DEBTOR'S ASSETS

### 4.1.    Real Property

The Debtors' real property interests are summarized in the table below:

| Description and Location of Property | | | Nature of Debtor's Interest in Property | Current Value of Debtor's Interest in Property without deducting any Secured Claim |
|---|---|---|---|---|
| Stoney Creek Condos | Gretna Road Branson, Taney, CTY, MO  APN: 07-7.0-36-000-000-014.000 | 580 entitled condo pads, heart of city near outlet mall and major entertainment venues. | Fee Title | $1,000,000.00 |
| Deer Canyon Preserve | Lots 1-5 and 11-15 Deer Canyon Preserve Phase I Summit County, UT | 10 Entitled Estate Lots - gated community above Jordanelle Reservoir | Fee Title | $1,200,000.00 |

| Blackridge Commercial | Approximately 250 Tonaquint Dr. St. George, Washington CTY, UT TID: SG-6-2-36-223 & SG-6-2-36-2002 | 17+ acres entitled commercial & 6 acres residential. | Fee Title | $3,000,000.00 |
|---|---|---|---|---|
| Promontory Club | Lots: Sunset Ridge 7, Painted Sky 5, 10, 26 & 28, Deer Crossing 24, 49, 55, 81, 82, Park City, Summit CTY, Utah | 10 High End Lots | Fee Title | $2,200,000.00 |
| Andalusia Residential Subdivision | 10658 South Dimple Dell Road Sandy, UT TID: 28-14-326-012 | Residential Development: 14,000 sq. foot home and 4X 1 acre+ equestrian lots w/ barn. | Fee Title | $2,500,000.00 |
| Bogus Basin Condos | Bogus Basin Ski Resort Boise CTY, ID | Entitled condo pads - Bogus Basin, Boise, ID | Fee Title | $2,000,000.00 |
| Powder Mountain Condominiums | Weber County, UT parcels: 23-012-0105, 23-012-0106, 23-012-0107, 23-012-0119, 23-123-0001 to 23-123-0031 | Ski-in-Ski-out condo lots - Powder Mtn, UT | Fee Title | $3,000,000.00 |
| Sleepy Ridge Golf Course Residential | 22 lots The Lakes at Sleepy Ridge Golf Course Orem, UT | 1st position trust deed - 22 lots | Fee Title | $1,400,000.00 |
| Southgate Townhomes | 2200 South Circle Drive Washington CTY, St. George, UT | 38 Townhome sites and 2nd position as additional collateral on 26 developed townhomes. | Fee Title | $700,000.00 |
| D&M Office Building | 7390 South Creek Road #203 Sandy, Salt Lake County, UT 84093 | Commercial Office Condo | Fee Title | $150,000.00 |

| Cedar Valley Acres | 95 Lots Cedar Valley Acres Subdivision, Cedar City, Iron CTY, UT | 95 single family residential lots | Deed in Trust Interest | |
| --- | --- | --- | --- | --- |
| Draper Single family residence | 14233 South Canyon Vine Cove Draper, Salt Lake CTY, Draper UT | 16,000 sq. ft luxury single family home | Fee Title | $1,000,000.00 |
| Makaha Beach lot | Lot 259 Makau Street Waianae, Honolulu CTY, HI TID: 8-4-010-060 | Residential lot - Makaha Beach, Oahu | Mortgage Interest | $180,000.00 |
| Haven Estates | 500 West 750 South Vernal, Uintah CTY, UT | 108 entry-level residential lots | Fee Title | $2,500,000.00 |
| Royal Point Residential | HWY 47 South Live Oak, FL Columbia CTY TID: 03752-000 | 36 x 2 to 14 acre single family residential lots | Fee Title | $1,000,000.00 |
| La Colonia Residential | Parcel 1 & 2 Phase II, La Colonia Subdivision Coachella, CA | 19 residential lots | Mortgage Interest | $190,000.00 |
| | | | **Total:** | **$22,020,000.00** |

### 4.1.1.  Personal Property

Cash:  As of the date of this Disclosure Statement, Harbor has cash on hand of approximately $88,000.00, and HRAF has no cash on hand.

HRAF, as assignee from Harbor, is the holder of three collectible loans.  First, HRAF holds a first priority mortgage position on a portion of the La Colonia Residential development in Coachella, California, consisting of 19 residential lots.  Debtor is currently pursuing a foreclosure of this loan and intends to acquire and liquidate the underlying real estate through the foreclosure process.

Second, Harbor or HRAF holds a first priority mortgage position on a single lot in Honolulu County, Hawaii.  HRAF has a deed-in-lieu of foreclosure executed by the borrower on such loan.

Third, HRAF holds a first priority position trust deed on 95 lots located in Iron County, Utah.  HRAF is not pursuing a foreclosure at this time due to the cost of such action.

Harbor holds a number of guaranties of loans which it does not believe are collectible.

Harbor owns the sole membership interest in HRAF, subject to the Bank's security interest.

Harbor has an interest in a $1.2 million improvement bond related to the Haven Estates development in Vernal, Utah.  As a result of significant negotiations, Vernal City has agreed to allow Harbor to use approximately $1.1 million of this bond to complete the infrastructure improvements on a portion of the Haven Estates lots.  This will improve the real property and ultimately benefit Harbor through increased proceeds of the liquidation of this real estate.

## 5.

## OTHER CONSIDERATIONS

The Plan affords holders of Claims the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders.  If the Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the Chapter 11 cases; (b) alternative plans of liquidation; or (c) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

### 5.1.    Feasibility of the Plan

Pursuant to the Plan, the Debtors will administer the Estates after consummation of the Plan, and liquidate property of the Estates for the benefit of the Debtors' creditors.  The forecast and liquidation analysis attached to this Disclosure Statement as Exhibit B demonstrates that the Plan is feasible.

### 5.2.    Continuation of the Case

If the Debtors were to remain in Chapter 11, and the Debtors were to continue in the administration of the Estates without the benefit of a plan of reorganization, the Debtors believe that creditor recoveries would be eroded as a result of higher professional fees.  In addition, it is likely that creditors would be delayed in receiving recoveries and that it would take a longer period of time for the Debtors to administer their Estates.

### 5.3.    Alternative Plans of Reorganization

If the Plan is not confirmed, another party in interest in the case could attempt to formulate and propose a different plan or plans.  Such plans might, theoretically, involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of their assets, or a combination thereof.  To date, the Debtors have not received any concrete suggestions for alternate plans.

### 5.4.    Liquidation under Chapter 7

If the Bankruptcy Cases were converted to a case under Chapter 7 of the Bankruptcy Code, a Chapter 7 trustee would be elected or appointed to liquidate the assets of the Debtors.  The proceeds of the liquidation would be distributed to the respective holders of Claims against the Debtors according to the priorities established by the Bankruptcy Code.

Under Chapter 7, a secured creditor whose claim is fully secured would be entitled to full payment, including interest, from the proceeds of the sale of its collateral. Unless its claim is nonrecourse, a secured creditor whose collateral is insufficient to pay its claim in full would be entitled to assert an unsecured claim for its deficiency. Claims entitled to priority under the Bankruptcy Code would be paid in full before any distribution to general unsecured creditors. Funds, if any, remaining after payment of secured claims and priority claims would be distributed pro rata to general unsecured creditors. If subordination agreements were enforced, senior creditors would be entitled to be paid in full before any distribution to subordinated creditors.

The Debtors are familiar with their properties, and believe that they would be in a better position to manage the liquidation of their assets for the benefit of creditors than would a Chapter 7 trustee, who would necessarily be a stranger to the Debtors' business and remaining assets. In addition, the Debtors are very familiar with the Claims asserted against the Estates and possible objections to Claims, and believes it would be more efficient for the Debtors to review the Claims as opposed to a Chapter 7 trustee.

### 5.5.    Liquidation Analysis

Attached as Exhibit B is a liquidation analysis for the Debtors. This analysis includes an analysis of the value available from the liquidation of the Debtor, along with an analysis of the estimated recovery that each impaired class would receive in the event of such liquidation. The Debtors believe that under any reasonable liquidation scenario, whether through the Plan or through Chapter 7, creditors should receive payment in full of their Claims.

### 5.6.    Consolidation

The Debtors have proposed their consolidation through the Plan pursuant to Bankruptcy Code § 1123(a)(5)(C). The Debtors do not believe that the proposed consolidation adversely affects creditors, because in any reasonable liquidation or reorganization scenario, creditors should be paid in full. The Debtors do not believe the Bank will be adversely affected by the proposed consolidation because the Plan proposes that the Bank's Lien on the Equity Interest in HRAF shall be deemed, automatically and without further action on the part of the Bank or the Debtors or the Reorganized Debtor, to be transferred to a first-priority Lien on all assets of HRAF. The Debtors believe at the proposed consolidation will simplify and rationalize its capital structure, and simply recognizes the economic reality that the Debtors have always operated as a single economic unit, notwithstanding that the Bank required the transfer of Harbor's assets to HRAF pursuant to the Forbearance Agreement. The Debtors do not believe that Creditors, other than the Bank, recognize any distinction between Harbor and HRAF. Creditors of Harbor will not be adversely affected by the proposed consolidation because the Plan proposes payment in full of all Creditors of Harbor.

### 5.7.    Risk Factors

Both failure to achieve confirmation of the Plan, and consummation of the Plan, are subject to a number of risks. These risks include the following: (i) real estate values have dropped substantially in recent years, and because the Debtors' primary assets are real estate, it is possible that its real estate will be sold for less than the Debtors predict; (ii) there is no assurance of recovery from any Causes of Action; (iii) Claims that the Debtors have disputed may be Allowed in full; and (iv) it is possible that Professional Fees could exceed the Debtors'

predictions.  In addition, there are certain risks inherent in the Chapter 11 process.  If certain standards set forth in the Bankruptcy Code are not met, the Bankruptcy Court will not confirm the Plan even if creditors accept the Plan.  Although the Debtors believe that the Plan meets such standards, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  If the Bankruptcy Court were to determine that such requirements were not met, it could require the Debtors to resolicit acceptances, which could delay and/or jeopardize confirmation of the Plan.  The Debtors believe that the solicitation of votes on the Plan will comply with section 1126(b) of the Bankruptcy Code and that the Bankruptcy Court will confirm the Plan.  However, the Debtors can provide no assurance that modifications of the Plan will not be required to obtain confirmation of the Plan, or that such modifications will not require a resolicitation of acceptances.

### 5.8.    Taxation

#### 5.8.1.  Introduction

The following discussion summarizes certain of the important federal income tax consequences of the transactions described herein and in the Plan.  This discussion is for informational purposes only and does not constitute tax advice.  This summary is based upon the Internal Revenue Code and the Treasury Regulations promulgated thereunder, including judicial authority and current administrative rulings and practice.  Neither the impact on foreign holders of claims and equity interests nor the tax consequences of these transactions under state and local law is discussed.  Also, special tax considerations not discussed herein may be applicable to certain classes of taxpayers, such as financial institutions, broker-dealers, life insurance companies and tax-exempt organizations.  Furthermore, due to the complexity of the transactions contemplated in the Plan, and the unsettled status of many of the tax issues involved, the tax consequences described below are subject to significant uncertainties.  No opinion of counsel has been obtained and no ruling has been requested from the Internal Revenue Service ("IRS") on these or any other tax issues.  There can be no assurance that the IRS will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained.  **HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ARE THEREFORE URGED TO CONSULT WITH THEIR TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

To ensure compliance with requirements imposed by the IRS in Circular 230, we inform you that, unless we expressly state otherwise in this communication (including any attachments), any tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or other matter addressed.

#### 5.8.2.  Tax Consequences to the Debtors

Generally, the Plan contemplates payment in full to the holders of Claims.  The Debtor should not recognize any income corresponding to the payment of Claims at a discount, because the Debtor is not proposing to pay Claims at a discount.

### 5.8.3.  Tax Consequences to Creditors

**In General**.  The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, on: (a) whether its Claim constitutes a debt or security for federal income tax purposes, (b) whether the claimant receives consideration in more than one tax year, (c) whether the claimant is a resident of the United States, (d) whether all the consideration by the claimant is deemed by be received by that claimant as part of an integrated transaction, (e) whether the claimant reports income using the accrual or cash method of accounting, and (f) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.

**Gain or Loss on Exchange**.  Generally, a holder of an Allowed Claim will realize a gain or loss on the exchange under the Plan of his Allowed Claim for cash and other property in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain recognized generally will be a capital gain (except to the extent the gain is attributable to accrued but unpaid interest or accrued market discount, as described below) if the Claim was a capital asset in the hand of an exchanging holder, and such gain would be a long-term capital gain if the holder's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.

Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset. For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

### 5.9.    Information Reporting and Backup Withholding

Under the backup withholding rules of the Internal Revenue Code, holders of Claims may be subject to backup withholding at the rate of 31 percent with respect to payments made pursuant to the Plan unless such holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income.  Any amount withheld under these rules will be credited against the holder's federal income tax liability.  Holders of Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### 5.10.   Importance of Obtaining Professional Assistance

**THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FEDERAL, STATE, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OWN TAX ADVISOR REGARDING SUCH TAX CONSEQUENCES.**

# 6.

## CAUSES OF ACTION

### 6.1.   Preferences

Under the Bankruptcy Code, a debtor may recover certain preferential transfers of property, including cash, made while insolvent during the 90 days immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts, to the extent the transferee received more than it would have in respect of the pre-existing debt had the debtor been liquidated under Chapter 7 of the Bankruptcy Code.  In the case of "insiders," the Bankruptcy Code provides for a one-year preference period.  There are certain defenses to such recoveries.  Transfers made in the ordinary course of the debtor's and transferee's business according to the ordinary business terms in respect of debts less than 90 days before the filing of a bankruptcy are not recoverable.  Additionally, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension of credit may constitute a defense to recovery, to the extent of any new value, against an otherwise recoverable transfer of property.  If a transfer is recovered by the debtor, the transferee has an unsecured claim against the debtor to the extent of the recovery.

The Debtors believe that they are presently solvent, and at all times since their inception, have also been solvent.  As a result, the Debtors do not intend to pursue any preference claims.

### 6.2.   Fraudulent Transfers

Under the Bankruptcy Code and various state laws, a debtor may recover certain transfers of property, including the grant of a security interest in property, made while insolvent or which rendered the debtor insolvent.  The Debtors do not believe that the Estate holds any fraudulent transfer claims, because they have at all times been solvent.

### 6.3.   Claims Against the Bank

The Debtors believe they have causes of action against the Bank, based on the Bank's breach of the covenant of good faith and fair dealing, and its attempted commercially unreasonable disposition of collateral.  These claims stem from the Bank's refusal to negotiate in good faith with the Debtors, and in particular the Bank's refusal to allow the Debtors to liquidate portions of its real estate portfolio for the benefit of the Bank.  The Bank pursued a foreclosure sale of Harbor's interest in HRAF, notwithstanding that the Bank had other avenues to collect the obligations owed by the Debtors which were less harmful to other stakeholders, and would nevertheless have resulted in payment to the Bank in full in a reasonable period of time.  The Bank's actions have damaged the Debtors, in that the Debtors were unable to reasonably liquidate their assets and to seize opportunities, such as offers to purchase the Debtors' real estate assets, which would have benefitted all stakeholders.  The Debtors have not quantified their damages which could be claimed, but believe the damages would exceed $1,000,000.  Nevertheless, if the Bank consents to the Debtors' liquidation pursuant to the terms of the Plan, the Debtors do not intend to pursue their potential Claims against the Bank.  On the other hand, should the Bank oppose the Plan, then the Debtors and the Reorganized Debtor reserve all of their rights to pursue their Claims against the Bank.

### 6.4.    Clark Real Estate Litigation

Harbor Real Asset Fund, LP is subject to a claim by Clark Real Estate for specific performance.  Specifically, Clark Real Estate has filed a motion to compel Harbor Real Asset Fund, LP to deliver a stock certificate for certain water shares or alternatively pay the monetary value of such shares.  The water shares are the subject of a separate and distinct action which was brought by Harbor Real Asset Fund, LP against a third party seeking delivery of the same water share certificate or a monetary payment for such shares.  The value of such water shares is approximately $200,000.00.

### 6.5.    Causes of Action Generally

The actions referred to above are not exhaustive.  The Debtors reserve their rights their right to identify and bring lawsuits based on additional preferences, fraudulent transfers, post-petition transfers, other Avoidance Actions, and any other actions.  The Debtors have conducted a limited analysis of potential recoveries under Chapter 5 of the Bankruptcy Code.  Any and all avoidance actions and rights pursuant to sections 542, 543, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and all causes of action under state, federal or other applicable law shall be retained and may be prosecuted or settled by the Debtors.

Under the Plan, the Debtors' rights to object to all Claims and Interests asserted against the Estates and all of the Debtors' or Estates' Causes of Action, including without limitation: (1) the Estates' Causes of Action asserted in any adversary proceeding which is pending as of the Confirmation Date; and (2) any and all other Claims and Causes of Action that the Debtors hold preconfirmation, including, but not limited to, Claims for unpaid accounts receivable and fraudulent transfer, shall vest in the Estates.

The Plan provides that unless a Claim or Cause of Action against any Person is expressly waived or released in the Plan or any Final Order of the Bankruptcy Court, the Reorganized Debtor expressly reserve such Claim or Cause of Action for later adjudication (including without limitation, Claims and Causes of Action not specifically identified or which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts and circumstances which may change or be different from those which the Debtors now believe to exist) and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claims preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Causes of Action upon or after the confirmation or consummation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except where such Claims or Causes of Action have been expressly released in the Plan or any other Final Order of the Bankruptcy Court.

### 7.

### VOTING PROCEDURES AND REQUIREMENTS

### 7.1.    Ballots and Voting Deadline

A ballot to be used to vote to accept or reject the Plan is enclosed with this Disclosure Statement.  A creditor who is voting must (1) carefully review the ballot and instructions thereon,

(2) complete and execute the ballot indicating the creditor's vote to either accept or reject the Plan, and (3) return the executed ballot to the address below.

Pursuant an Order of the Bankruptcy Court, to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received by counsel for the Trustee by 4:00 p.m. Salt Lake City time, on November 30, 2010, at the following address:

> George Hofmann
> c/o Harbor Ballot Tabulation
> Parsons Kinghorn Harris
> 111 East Broadway, 11th Floor
> Salt Lake City, Utah 84111

### 7.2.    Creditors Entitled to Vote

Each holder of an Allowed Claim in an impaired Class which retains or receives property under the Plan is entitled to vote separately to accept or reject the Plan.

### 7.3.    Nonconsensual Confirmation

If any impaired Class entitled to vote does not accept the Plan, or if any impaired class is deemed to have rejected the Plan, the Debtors reserves the right (i) to confirm the Plan under Section 1129(b) of the Bankruptcy Code, and (ii) to amend the Plan to the extent necessary to obtain entry of a Confirmation Order.

### 7.4.    Voting Procedures

All voting procedures are described in the Bankruptcy Court's Order (i) Approving Disclosure Statement with Respect to Joint Plan of Liquidation under Chapter 11 of the Bankruptcy Code, (ii) Establishing Voting Record Date, (iii) Approving Solicitation Procedures, Forms of Ballots, and Manner of Notice, and (iv) Fixing the Deadline for Filing Objections to the Confirmation of the Plan, entered on October 28, 2010.

### 7.5.    Vote Required for Class Acceptance.

The Bankruptcy Code defines acceptance of a plan of reorganization by a class of Claims as the acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half in number of the allowed Claims of the class actually voting to accept or reject the proposed plan of reorganization.

**THE DEBTORS STRONGLY URGE ALL IMPAIRED CREDITORS TO VOTE TO ACCEPT THE PLAN.**

Dated: September 9, 2010

**Harbor Real Asset Fund, L.P.**
By Harbor Capital Partners, LLC (general partner of Harbor Real Asset Fund, L.P.)
By True North Funding, LLC (sole member of Harbor Capital Partners, LLC)

By: _____
Ryan A. Relyea, sole Member with management authority

By: _____
Ryan A. Relyea, Managing Director of Harbor Capital Partners, LLC, with authority of Manager

By: _____
Phil Holmes, Director of Harbor Capital Partners, LLC, with authority as Manager


**HRAF HOLDINGS, LLC, by its Member:**

**Harbor Real Asset Fund, L.P.**
By Harbor Capital Partners, LLC (general partner of Harbor Real Asset Fund, L.P.)
By True North Funding, LLC (sole member of Harbor Capital Partners, LLC)

By: _____
Ryan A. Relyea, sole Member with management authority

By: _____
Ryan A. Relyea, Managing Director of Harbor Capital Partners, LLC, with authority as Manager

By: _____
Phil Holmes, Director of Harbor Capital Partners, LLC, with authority as Manager

# EXHIBIT A

George Hofmann (10005)
Matthew M. Boley (8536)
Steven C. Strong (6340)
**Parsons Kinghorn Harris**
A Professional Corporation
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
Telephone: (801) 363-4300
Facsimile:  (801) 363-4378

Proposed Attorneys for Debtors-in-Possession
HRAF Holdings, LLC and Harbor Real Asset Fund, LP

### IN THE UNITED STATES BANKRUPTCY COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re<br><br>HRAF HOLDINGS, LLC, and<br>HARBOR REAL ASSET FUND, LP,<br><br>Debtors. | Bankruptcy No. 10-32433 (RKM)<br>Bankruptcy No. 10-32436 (RKM)<br><br>Chapter 11<br><br>[Filed Electronically] |

**PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Dated:  September 10, 2010

HRAF Holdings, LLC and Harbor Real Asset Fund, LP hereby propose the following joint plan of reorganization under Section 1121 of Title 11 of the United States Code. The following shall constitute a separate plan of reorganization proposed by each of the foregoing debtors.

## ARTICLE I

### DEFINITIONS AND CONSTRUCTION OF TERMS

For purposes of this Plan, the following terms shall have the meanings specified in this Article I. A term used but not defined herein, which is also used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code. Wherever from the context it appears appropriate, each term stated shall include both the singular and the plural, and pronouns shall include the masculine, feminine and neuter, regardless of how stated. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular Section, sub-Section or clause contained in the Plan. The rules of construction contained in Section 102 of the Bankruptcy Code shall apply to the terms of this Plan. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

"Administrative Expense Claim" shall mean a Claim that is Allowed under Section 503(b) of the Bankruptcy Code and that is entitled to priority under Section 507(a)(1) of the Bankruptcy Code, including, without limitation,

(a)     fees and expenses of Professionals Allowed pursuant to an Order of the Bankruptcy Court, and

(b)     all fees and charges assessed against the Estates pursuant to 28 U.S.C. § 1930.

"Allowed" shall mean, with reference to any Claim:

(a)     a Claim that has been listed by the Debtors in their Schedules and (i) is not listed as disputed, contingent or unliquidated, and (ii) is not a Claim as to which a proof of claim has been filed;

(b)     a Claim as to which a timely proof of claim has been filed by the Bar Date and either (i) no objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery, has been made on or before any applicable deadline, or (ii) if an objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery has been interposed, the extent to which such Claim has been allowed (whether in whole or in part) by a Final Order;

(c)     a Claim arising from the recovery of property under Section 550 or 553 of the Bankruptcy Code and allowed in accordance with Section 502(h) of the Bankruptcy Code; or

(d)    any Claim expressly allowed under this Plan or pursuant to the Confirmation Order.

"Avoidance Actions" shall mean Causes of Action arising or held by the Estate under Sections 502, 510, 541, 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws.

"Bank" shall mean Bank of America, N.A.

"Bankruptcy Cases" shall mean the Debtors' cases pending in the Bankruptcy Court.

"Bankruptcy Code" shall mean Title 11 of the United States Code, as amended from time to time, as applicable to the Bankruptcy Cases.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Utah in which the Bankruptcy Cases are pending and, to the extent of any reference under 28 U.S.C. § 157, the unit of such District Court specified pursuant to 28 U.S.C. § 151.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure as promulgated under 28 U.S.C. § 2075, and any local rules of the Bankruptcy Court.

"Bar Date" shall mean: (i) January __, 2011 with respect to a Claim against the Estate other than a Claim of a Governmental Unit; and (ii) March ___, 2011 with respect to a Claim against the Estate of a Governmental Unit.

"Business Day" shall mean any day other than a Saturday, Sunday or legal holiday recognized in the State of Utah.

"Cash" shall mean lawful currency of the United States of America (including wire transfers, cashier's checks drawn on a bank insured by the Federal Deposit Insurance Corporation, certified checks and money orders).

"Causes of Action" shall mean, without limitation, any and all actions, causes of action, defenses, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims or proceedings to recover money or property and demands of any nature whatsoever, whether known or unknown, in law, equity or otherwise, including, without limitation, Avoidance Actions.

"Claim" shall mean a claim against a Person or its property as defined in Section 101(5) of the Bankruptcy Code, including, without limitation, (i) any right to payment, whether or not such right is reduced to judgment, and whether or not such right is liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) any right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment, whether or not

such right to an equitable remedy is reduced to judgment, or is fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"Class" shall mean those classes designated in Article III of this Plan.

"Collateral" shall mean any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable law.

"Confirmation Date" shall mean the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket in the Bankruptcy Cases.

"Confirmation Order" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to the provisions of the Bankruptcy Code, and any supplementary orders of the Bankruptcy Court issued in furtherance of the Plan.

"Contingent or Unliquidated Claim" shall mean any Claim for which a proof of claim has been filed with the Bankruptcy Court but which was not filed in a sum certain, or which has not occurred and is dependent upon a future event that has not occurred or may never occur, and which has not been Allowed.

"Convenience Claim" shall mean all General Unsecured Claims of a single holder of a type which would otherwise be included in Class 15 which are either (i) $3,000 or less in the aggregate; or (ii) greater than $3,000 in the aggregate but as to which the holder thereof has elected voluntarily to reduce to $3,000 by making a Convenience Class Election.

"Convenience Class Election" shall mean an election by a holder of a General Unsecured Claim that would otherwise be included in Class 15 within the time fixed by the Court for voting on the Plan, to have such Claim treated as a Convenience Class Claim.

"Debtors" shall mean collectively HRAF Holdings, LLC and Harbor Real Asset Fund, LP.

"Disclosure Statement" shall mean the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, in the form approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code.

"Disputed Claim" shall mean:

(a)    if no proof of claim relating to a Claim has been filed, a claim that is listed in the Schedules as unliquidated, disputed or contingent; or

(b)    if a proof of claim relating to a Claim has been filed, a Claim as to which a timely objection or request for estimation, or request to equitably subordinate or otherwise limit recovery in accordance with the Bankruptcy Code and the Bankruptcy

Rules, has been made, or which is otherwise disputed by the Debtors, or the Reorganized Debtor in accordance with applicable law, which objection, request for estimation, action to limit recovery or dispute has not been withdrawn or determined by Final Order; or

> (c)     a Claim which is a Contingent or Unliquidated Claim.

"Disputed Claim Amount" shall mean the amount set forth in the proof of claim relating to a Disputed Claim or an amount estimated pursuant to an order of the Bankruptcy Court in respect of a Disputed Claim in accordance with Section 502(c) of the Bankruptcy Code.

"Disputed Claims Reserve" shall have the meaning set forth in Section 6.4 hereof.

"Distribution Record Date" shall mean the Confirmation Date.

"Effective Date" shall mean the date which is 30 days after the Confirmation Date, or if such date is not a Business Day, the next succeeding Business Day; provided, however, that if, as of such date, all conditions precedent to the occurrence of the Effective Date set forth in Section 9.1 of the Plan have not been satisfied or waived, then the first Business Day immediately following the day upon which all such conditions have been satisfied or waived.

"Equity Interest" shall mean any membership interest or the interest of any holder of common or preferred equity securities of any of the Debtors or of any general or limited partnership interest in any of the Debtors, and all options, warrants and rights, contractual or otherwise, to acquire any such equity securities or to acquire any general or limited partnership interest in any of the Debtors, as such interests exist immediately prior to the Effective Date.

"Estates" shall mean the estates created in the Bankruptcy Cases pursuant to Section 541 of the Bankruptcy Code.

"Final Order" shall mean an order or judgment which has not been reversed, stayed, modified or amended and, as to which (i) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for certiorari, review or rehearing is pending, or (ii) if appeal, review, reargument or certiorari of the order has been sought, the order has been affirmed or the request for review, reargument or certiorari has been denied and the time to seek a further appeal, review, reargument or certiorari has expired, and as a result of which such order shall have become final and nonappealable in accordance with applicable law; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order.

"Final Sales Period" shall mean 36 months from the Effective Date.

"General Unsecured Claim" shall mean a Claim that is not a Secured Claim or that is not entitled to priority of payment under Section 507 of the Bankruptcy Code.

"Harbor" shall mean debtor, Harbor Real Asset Fund, LP.

"HRAF" shall mean debtor, HRAF Holdings, LLC.

"Initial Distribution Date" shall mean the date that is 30 days after the Effective Date, or the next succeeding Business Day if such thirtieth day is not a Business Day.

"Initial Sales Period" shall mean 24 months from the Effective Date.

"Lien" shall have the meaning set forth in Section 101(37) of the Bankruptcy Code; except that a lien that has been avoided in accordance with Sections 544, 545, 546, 547, 548, 549 or 553 of the Bankruptcy Code shall not constitute a Lien.

"Person" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated association or organization, Governmental Unit or political subdivision thereof.

"Petition Date" shall mean September 9, 2010.

"Plan" shall mean this Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, including, without limitation, the exhibits, supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time.

"Plan Rate" shall mean the interest rate determined pursuant to 28 USC. § 1961 as of the Petition Date.

"Priority Claims" shall mean any and all Claims (or portions thereof), if any, entitled to priority under Section 507(a) of the Bankruptcy Code other than Administrative Expense Claims.

"Priority Tax Claims" shall mean any Claim of a Governmental Unit entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

"Pro Rata" shall mean a proportionate share of the total distribution made at any particular time under this Plan to the holders of Allowed Claims in a Class, such that the ratio of the consideration distributed on account of an Allowed Claim in a Class to the amount of such Allowed Claim is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims in such Class to the total of all Allowed Claims in such Class.

"Professionals" shall mean (i) those Persons employed pursuant to an order of the Bankruptcy Court in accordance with Sections 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (ii) those Persons for which compensation and reimbursement is allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

"Remaining Net Proceeds" shall have the meaning provided in Section 4.2(b) of this Plan.

"Reorganized Debtor" shall mean the Debtors, as reorganized on the Effective Date, and consolidated pursuant to Bankruptcy Code § 1123(a)(5)(C), under the terms of this Plan.

"Schedules" shall mean the schedules of assets and liabilities, the list of holders of interests and the statements of financial affairs filed by the Debtors under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists and statements have been or may be supplemented or amended from time to time.

"Secured Claim" shall mean any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with Section 506(a) of the Bankruptcy Code, or, in the event that such Claim is a claim of setoff under Section 553 of the Bankruptcy Code, to the extent of such setoff.

## ARTICLE II

## TREATMENT OF ALLOWED ADMINISTRATIVE EXPENSE CLAIMS AND ALLOWED PRIORITY TAX CLAIMS

**2.1    Non-Classification.** As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified for the purposes of voting on, or receiving distributions under, the Plan. All such Claims are instead treated separately in accordance with the terms in this Article II.

**2.2    Administrative Expense Claims.**

(a)    General. Except as otherwise agreed to by the Debtors and the holder of an Allowed Administrative Expense Claim, each such holder shall be paid in full in Cash on the later of (i) the date such Allowed Administrative Expense Claim becomes due in accordance with its terms, and (ii) the Effective Date. If the Debtors dispute any portion of an Administrative Expense Claim, the Debtors shall pay such Claim within 30 days after the entry of a Final Order with respect to the allowance of such disputed Administrative Expense Claim.

(b)    U.S. Trustee's Fees. The United States Trustee's quarterly fees shall be paid in full without prior approval pursuant to 28 U.S.C. § 1930 on or before the Effective Date.

(c)    Professional Compensation and Expense Reimbursement Claims.

(1)    Each Professional may request that its fees and expenses be paid in accordance with the procedures set forth in the order of the Bankruptcy Court approving the Disclosure Statement. Such Professional shall file a final application for the allowance of compensation for services rendered or reimbursement of expenses

incurred through and including the Effective Date within thirty days of the Effective Date. Any award granted by the Bankruptcy Court shall be paid (i) within ten days of the entry of the order of the Bankruptcy Court approving such award, unless a stay is obtained, or (ii) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Expense Claim and the Debtors.

(2)    All fees and expenses of Professionals for services rendered after the Confirmation Date in connection with the Bankruptcy Cases and the Plan including, without limitation, those relating to the occurrence of the Effective Date, shall be paid by the Reorganized Debtor upon receipt of reasonably detailed invoices therefore in such amounts and on such terms as such Professional and the Reorganized Debtor may agree, without the need for further Bankruptcy Court authorization or entry of a Final Order.

**2.3    Priority Tax Claims.** At the sole election of the Reorganized Debtor, each holder of an Allowed Priority Tax Claim shall be paid either (i) upon such terms as may be agreed to between the Debtors and such holder of an Allowed Priority Tax Claim, (ii) in full in Cash on the later of the Effective Date or the date that such Allowed Priority Tax Claim would have been due if the Bankruptcy Case had not been commenced, or (iii) in four deferred equal annual Cash payments, commencing on the Effective Date, in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate prescribed by Bankruptcy Code § 511.

# ARTICLE III

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Claims, other than Administrative Expense Claims and Priority Tax Claims, shall be classified for all purposes, including voting on, confirmation of, and distribution pursuant to the Plan, as follows:

Class 1 – Priority Claims.  Class 1 shall consist of all Allowed Priority Claims.

Class 2 – Disputed Secured Claim of the Bank.  Class 2 shall consist of the Disputed Secured Claim of the Bank.

Class 3 – Secured Claim of Reynolds Brothers Construction.  Class 3 shall consist of the Allowed Secured Claim of Reynolds Brothers Construction.

Class 4 – Secured Claim of Salt Lake County Treasurer.  Class 4 shall consist of the Allowed Secured Claim of the Salt Lake County Treasurer.

Class 5 – Secured Claim of Summit County.  Class 5 shall consist of the Allowed Secured Claim of Summit County.

Class 6 – <u>Secured Claim of Taney County Collector</u>.  Class 6 shall consist of the Allowed Secured Claim of Taney County Collector.

Class 7 – <u>Secured Claim of Uintah County</u>.  Class 7 shall consist of the Allowed Secured Claim of Uintah County.

Class 8 – <u>Secured Claim of Utah County</u>.  Class 8 shall consist of the Allowed Secured Claim of Utah County.

Class 9 – <u>Secured Claim of Wasatch County Corporation</u>.  Class 9 shall consist of the Allowed Secured Claim of Wasatch County Corporation.

Class 10 – <u>Secured Claim of Washington County</u>.  Class 10 shall consist of the Allowed Secured Claim of Washington County.

Class 11 – <u>Secured Claim of Weber County</u>.  Class 11 shall consist of the Allowed Secured Claim of Weber County.

Class 12 – <u>Secured Claim of Boise County Tax Collector</u>.  Class 12 shall consist of the Allowed Secured Claim of the Boise County Tax Collector.

Class 13 – <u>Secured Claim of Jordanelle Special Services District</u>.  Class 13 shall consist of the Allowed Secured Claim of Jordanelle Special Services District.

Class 14 – <u>Miscellaneous Secured Claims</u>.  Class 14 shall consist of the Allowed Secured Claim of any other holder of an Allowed Secured Claim against the Debtors that is not specifically classified in another Class.

Class 15 – <u>General Unsecured Claims</u>.  Class 15 shall consist of all Allowed General Unsecured Claims.

Class 16 – <u>Convenience Claims</u>.  Class 16 shall consist of all Allowed Convenience Claims.

Class 17 – <u>Claim of Mallorca Partners</u>.  Class 17 shall consist of the Allowed Claim of Mallorca Partners.

Class 18 – <u>Equity Interests in Harbor</u>.  Class 18 shall consist of all Equity Interests in Harbor.

Class 19 – <u>Equity Interest in HRAF</u>.  Class 19 shall consist of the Equity Interest in HRAF.

# ARTICLE IV

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

### 4.1    Class 1 - Priority Claims

(a)    Impairment and Voting.  Class 1 is unimpaired under the Plan. Each holder of an Allowed Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions.  Unless otherwise agreed by a holder of an Allowed Priority Claim, each holder of an Allowed Priority Claim shall receive Cash in an amount equal to such Allowed Priority Claim on the later of the Initial Distribution Date and the date such Priority Claim becomes an Allowed Priority Claim, or as soon thereafter as is practicable.

### 4.2    Class 2 – Disputed Secured Claim of Bank

(a)    Impairment and Voting.  Class 2 is impaired under the Plan.  The Bank shall be entitled to vote to accept or reject the Plan.

(b)    Payment.  The full amount of the Bank's Claim, including interest and attorneys' fees to the extent allowable under Bankruptcy Code § 506(b), shall be paid in full through the proceeds of the sale and liquidation of the Reorganized Debtor's property not later than the end of the Initial Sales Period.  The Bank's Lien on the Equity Interest in HRAF shall be deemed, automatically and without further action on the part of the Bank or the Debtors or the Reorganized Debtor, to be transferred to a first-priority Lien on all assets of HRAF.  The Bank shall retain this Lien, on the property as it vests in the Reorganized Debtor on the Effective Date, until its Claim is paid in full.  Provided, however, that notwithstanding anything in this Plan to the contrary, nothing in this Plan shall provide the Bank any right to credit bid under Bankruptcy Code § 363(k) on HRAF's assets, either before or after the transfer of those assets to the Reorganized Debtor.  As the Reorganized Debtor's property is sold or liquidated, after payment of expenses of sale, payment to any co-owners or participants in such property and any liens or other encumbrances on such property (including taxes and HOA fees), the Reorganized Debtor shall pay the Bank 90% of the net proceeds of sales or liquidations. The remaining 10% of the net proceeds (the "Remaining Net Proceeds") shall revest in the Reorganized Debtor, free and clear of any Claim or Lien, but subject to the terms of the Plan.

### 4.3    Class 3 - Secured Claim of Reynolds Brothers Construction

(a)    Impairment and Voting.  Class 3 is unimpaired under the Plan. Reynolds Brothers Construction is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Payment. The Debtors anticipate that this Claim will have been paid in full before the Confirmation Date through a pending motion to approve the sale of the Estates' Dimple Dell property pursuant to Bankruptcy Code § 363.

### 4.4   Class 4 - Secured Claim of Salt Lake County Treasurer

(a)    Impairment and Voting. Class 4 is unimpaired under the Plan. Salt Lake County Treasurer is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Payment. The Debtors anticipate that this Claim will have been paid in full before the Confirmation Date through a pending motion to approve the sale of the Estates' Dimple Dell and Canyon Vine Cove properties pursuant to Bankruptcy Code § 363.

### 4.5   Class 5 - Secured Claim of Summit County

(a)    Impairment and Voting. Class 5 is impaired under the Plan. Summit County shall be entitled to vote to accept or reject the Plan.

(b)    Payment. As Collateral which secures a portion of Summit County's Secured Claim is sold, the Reorganized Debtor will pay in full the portion of Summit County's Secured Claim attributable to such Collateral. Summit County's Secured Claim shall be paid in full not later than the end of the Final Sales Period. Summit County shall retain its Lien until its Claim is paid in full.

### 4.6   Class 6 - Secured Claim of Taney County

(a)    Impairment and Voting. Class 6 is impaired under the Plan. Taney County shall be entitled to vote to accept or reject the Plan.

(b)    Payment. The Reorganized Debtor shall pay this Claim in full through the proceeds of the sale of the Collateral securing the Claim of Taney County, not later than the Final Sales Period. Taney County shall retain its Lien until its Claim is paid in full.

### 4.7   Class 7 - Secured Claim of Uintah County

(a)    Impairment and Voting. Class 7 is impaired under the Plan. Uintah County shall be entitled to vote to accept or reject the Plan.

(b)    Payment. As Collateral which secures a portion of Uintah County's Secured Claim is sold, the Reorganized Debtor will pay in full the portion of Uintah County's Secured Claim attributable to such Collateral. Uintah County's Secured Claim shall be paid in full not later than the end of the Final Sales Period. Uintah County shall retain its Lien until its Claim is paid in full.

**4.8**   **Class 8 - Secured Claim of Utah County**

(a)   Impairment and Voting.  Class 8 is unimpaired under the Plan. Utah County is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Payment.  The Debtors anticipate that this Claim will have been paid in full before the Confirmation Date through a pending motion to approve the sale of the Estates' Sleepy Ridge property pursuant to Bankruptcy Code § 363.

**4.9**   **Class 9 - Secured Claim of Wasatch County**

(a)   Impairment and Voting.  Class 9 is impaired under the Plan. Wasatch County shall be entitled to vote to accept or reject the Plan.

(b)   Payment.  As Collateral which secures a portion of Wasatch County's Secured Claim is sold, the Reorganized Debtor will pay in full the portion of Wasatch County's Secured Claim attributable to such Collateral.  Wasatch County's Secured Claim shall be paid in full not later than the end of the Final Sales Period.  Wasatch County shall retain its Lien until its Claim is paid in full.

**4.10**   **Class 10 - Secured Claim of Washington County**

(a)   Impairment and Voting.  Class 10 is impaired under the Plan. Washington County shall be entitled to vote to accept or reject the Plan.

(b)   Payment.  As Collateral which secures a portion of Washington County's Secured Claim is sold, the Reorganized Debtor will pay in full the portion of Washington County's Secured Claim attributable to such Collateral.  Washington County's Secured Claim shall be paid in full not later than the end of the Final Sales Period.  Washington County shall retain its Lien until its Claim is paid in full.

**4.11**   **Class 11 - Secured Claim of Weber County**

(a)   Impairment and Voting.  Class 11 is impaired under the Plan. Weber County shall be entitled to vote to accept or reject the Plan.

(b)   Payment.  As Collateral which secures a portion of Weber County's Secured Claim is sold, the Reorganized Debtor will pay in full the portion of Weber County's Secured Claim attributable to such Collateral.  Weber County's Secured Claim shall be paid in full not later than the end of the Final Sales Period.  Weber County shall retain its Lien until its Claim is paid in full.

**4.12**   **Class 12 - Secured Claim of Boise County Tax Collector**

(a)   Impairment and Voting.  Class 12 is impaired under the Plan.  The Boise County Tax Collector shall be entitled to vote to accept or reject the Plan.

(b)    Payment.  As Collateral which secures a portion of the Boise County Tax Collector's Secured Claim is sold, the Reorganized Debtor will pay in full the portion of the Boise County Tax Collector's Secured Claim attributable to such Collateral.  Boise County Tax Collector's Secured Claim shall be paid in full not later than the end of the Final Sales Period.  The Boise County Tax Collector shall retain its Lien until its Claim is paid in full.

### 4.13   Class 13 - Secured Claim of Jordanelle Special Services District

(a)    Impairment and Voting.  Class 13 is impaired under the Plan. Jordanelle Special Services District shall be entitled to vote to accept or reject the Plan.

(b)    Payment.  As Collateral which secures a portion of Jordanelle Special Services District's Secured Claim is sold, the Reorganized Debtor will pay in full the portion of Jordanelle Special Services District's Secured Claim attributable to such Collateral.  Jordanelle Special Services District's Secured Claim shall be paid in full not later than the end of the Final Sales Period.  Jordanelle Special Services District shall retain its Lien until its Claim is paid in full.

### 4.14   Class 14 – Miscellaneous Secured Claims

(a)    Impairment and Voting.  Class 14 is unimpaired under the Plan. Each holder of an Allowed Secured Claim that is not otherwise classified under this Plan is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Subclassification.  Each Allowed Secured Claim in this Class shall constitute a separate Class numbered 4.14.1, 4.14.2, 4.14.3 and so on.

(c)    Distributions.  Unless otherwise agreed by the holder of an Allowed Secured Claim, at the option of the Reorganized Debtor, a holder of an Allowed Secured Claim shall receive one of the following:  (i) Cash in an amount equal to such Allowed Secured Claim, including any interest thereon required to be paid pursuant to Section 506(b) of the Bankruptcy Code, on the later of the Initial Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable, (ii) return of the Collateral securing its Allowed Secured Claim, or the proceeds of such Collateral, in full and complete satisfaction thereof on the later of the Initial Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable, or (iii) reinstatement of the debt constituting the Allowed Secured Claim in accordance with Section 1124(2) of the Bankruptcy Code, thereby rendering such Claim unimpaired.

### 4.15   Class 15 - General Unsecured Claims

(a)    Impairment.  Class 15 is unimpaired under the Plan.  Each holder of an Allowed General Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(a)    Distributions. Each holder of an Allowed General Unsecured Claim shall be paid 100% of the principal amount of such holder's Allowed General Unsecured Claim, plus interest at the Plan Rate, not later than the end of the Final Sales Period.

### 4.16    Class 16 – Convenience Claims

(a)    Impairment and Voting. Class 16 is impaired under the Plan. Holders of Class 16 Claims shall be entitled to vote to accept or reject the Plan.

(b)    Distributions. Each holder of an Allowed Convenience Claim, in full and final satisfaction of such Claim, shall receive cash in an amount equal to 80% of such Allowed Convenience Claim on the later of the Effective Date and the date such Convenience Claim becomes an Allowed Convenience Claim, or as soon thereafter as is practicable, and shall receive no other distributions under this Plan on account of such Claim.

### 4.17    Class 17 – Mallorca Partners Claim

(a)    Impairment and Voting. Class 17 is impaired under the Plan. Holders of Class 17 Claims shall be entitled to vote to accept or reject the Plan.

(b)    Distributions. Mallorca Partners' acceptance of the Plan shall constitute its voluntary agreement to subordinate its Claim to all other Classes of Claims. The Reorganized Debtor shall pay Mallorca Partners' Claim in full, plus interest at the Plan Rate, not later than the end of the Final Sales Period.

### 4.18    Class 18 – Equity Interests in Harbor

(a)    Impairment. Class 18 is unimpaired under the Plan. Each holder of an Equity Interest in Harbor is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. Each record holder of Equity Interest in Harbor shall retain its interest in Harbor, as the Reorganized Debtor.

### 4.19    Class 19 – Equity Interest in HRAF

Treatment. Upon Effective Date, the Equity Interest in HRAF shall be deemed to be cancelled.

### ARTICLE V

### MEANS FOR EXECUTION OF THE PLAN

5.1    Administration of the Estate. The Reorganized Debtor shall administer the Estates after consummation of the Plan. The Reorganized Debtor shall hold all rights, powers, and duties of a trustee of the Estates under Chapter 11 of the

Bankruptcy Code. The Reorganized Debtor shall reduce all property of the Estates and Causes of Action to Cash, and distribute such Cash pursuant to the provisions of this Plan. The Reorganized Debtor shall use such Cash to pay the holders of Claims until such Cash is exhausted.

     **5.2**   **Liquidation of Remaining Property of Estate**. Following the Effective Date, the Reorganized Debtor shall conduct an orderly liquidation of the remaining property of the consolidated Estates consistent with the terms of the Plan.

     **5.3**   **Consolidation of Estates**. On the Effective Date, the Estates shall be deemed consolidated pursuant to Bankruptcy Code § 1123(a)(5). The consolidation of the Estates shall include, but shall not be limited to, the following:

          (a)   <u>Assets</u>. All assets of the Estates shall be consolidated and shall vest in the Reorganized Debtor as of the Effective Date. All assets of HRAF shall remain subject to a first-priority Lien in favor of the Bank as provided in Section § 4.2(b) of the Plan above, and subject to the limitations of that section.

          (b)   <u>Distributions</u>. Distributions shall be made to holders of Claims on a consolidated basis. Duplicate Claims filed by a single creditor against both Estates shall be disallowed; any joint or several liability of the Debtors shall be deemed to be one obligation of the Estates.

          (c)   <u>Inter-Debtor Claims</u>. Any Claims of Harbor against HRAF and vice-versa shall be deemed released and discharged on the Effective Date. This release and discharge includes, without limitation, any Avoidance Actions and any set-off rights. The Debtors do not believe that any such inter-debtor claims exist.

          (d)   <u>Guaranties</u>. Any guaranties by HRAF of obligations of Harbor, and vice-versa, shall be eliminated and extinguished so that any claim against any such Debtor and any guarantee thereof executed by any other such Debtor and any joint or several liability of any such Debtors shall be deemed one obligation of the Estates.

     **5.4**   **Marketing and Sale of Assets**. The Reorganized Debtor shall be solely responsible and shall be vested with all power and authority to sell as many of the Estates' assets and properties as it determines to be necessary or advisable to allow for payment in full of Allowed Claims as provided in this Plan. The Reorganized Debtor shall use its best efforts to sell sufficient assets and properties to pay in full any Allowed Claim of the Bank not later than the Initial Sales Period; and to pay in full all other Allowed Claims not later than the Final Sales Period; all subject to the terms and conditions of this Plan.

     **5.5**   **Marketing Decisions**. Upon the Effective Date and as frequently thereafter as the Reorganized Debtor deems appropriate, the Reorganized Debtor shall review the performance of the real estate brokers and agents retained to list and sell the Estates' property. In the exercise of its business judgment, and without notice or a hearing, the Reorganized Debtor may extend the contracts with such brokers and agents on such terms and conditions as it deems appropriate, or it may retain another

broker or agent on terms it deems appropriate.  No broker or agent whose services have been terminated by the Debtors or the Reorganized Debtor shall receive a commission or other compensation as a result of the sale of property in which such broker or agent did not directly participate.  Finally, the Reorganized Debtor shall direct adjustments to listing prices for assets as it, in its sole and complete discretion, deems appropriate to satisfy its obligations under this Plan.

    5.6    **Notice of Proposed Sales; Procedure for Objections**.  If the Reorganized Debtor determines to accept an offer to purchase property of the Estates, then it shall serve notice of the terms of the sale on (i) the Bank (until the Bank is paid in full); (ii) the Office of the United States Trustee; (iii) the Holder of any Claim secured by the property to be sold; and (iv) any party who filed with the Court a request for notices served under this Section of the Plan.  The Reorganized Debtor shall also file a copy of the notice with the Bankruptcy Court.  Any party in interest may file a motion with the Court to prohibit the sale; provided, however, that any such motion must be filed no less than ten calendar days after the filing of the notice and must be scheduled for hearing no later than thirty days after the date of the filing of the motion.  In the absence of a timely motion filed by a party in interest pursuant to the preceding sentence, the Debtor shall be authorized to immediately consummate the proposed transaction.

    5.7    **Sales Free and Clear of Liens and Subject to Bankruptcy Code §
506(c)**.  If the Reorganized Debtor desires to sell property free and clear of liens, encumbrances, and other interests pursuant to Bankruptcy Code §§ 363(f) and/or 1123(a)(5)(D), or desires to seek recovery of the reasonable, necessary costs and expenses of preserving, or disposing of, the property pursuant to Bankruptcy Code § 506(c), then the Reorganized Debtor may obtain such relief only after notice and a hearing.  Notice shall be appropriate and sufficient if mailed to the holders of all Claims secured or allegedly secured by the Property to give at least twenty days notice before the hearing.  If the Bankruptcy Court approves such a motion, Liens, encumbrances, and other interests (subject to any recovery awarded pursuant to Bankruptcy Code § 506(c) shall attach to the proceeds of the sale subject to the distribution provisions and priorities of the Plan.

    5.8    **Sale for Amount Insufficient to Pay Outstanding Liens**. In accordance with the procedures set forth in this Plan, the Reorganized Debtor may accept and offer for the sale of property notwithstanding the fact that the proceeds of sale will be insufficient to pay costs of sale and Liens of holders of Allowed Secured Claims on said property.  In such an event, the holder of an Allowed Secured Claim with a Lien on the property to be sold (other than the Bank) shall have ten days from notice served under paragraph 5.7 in which to exercise its right under Bankruptcy Code § 363(k).  In the case of the Bank, should the Bank object to a sale free and clear of its interests in the Reorganized Debtor, the Bank shall have ten days from notice served under paragraph 5.7 to file a motion with the Bankruptcy Court to prohibit the sale.  If the holder of an Allowed Secured Claim does not exercise its rights and does not timely object to the sale, then the Bankruptcy Court may enter an order approving the sale without a hearing and the sale may be immediately consummated.

**5.9    Employment of Professionals**. The Reorganized Debtor may employ attorneys, accountants, or other professionals as it may deem appropriate and pay such professionals reasonable fees and expenses. Professionals employed by the Reorganized Debtor shall not be subject to Bankruptcy Court approval, and their compensation shall not be subject to Bankruptcy Court approval.

## ARTICLE VI

## IMPLEMENTATION OF THE PLAN

**6.1    Method of Distributions Under the Plan.**

(a)    In General. Subject to Bankruptcy Rule 9010, all distributions under the Plan to be made by the Reorganized Debtor to the holder of each Allowed Claim shall be mailed by first class mail, postage prepaid, to the address of such holder as listed on the Schedules as of the Distribution Record Date, unless the Reorganized Debtor has been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address for such holder different from the address reflected on the Schedules. The Reorganized Debtor shall have no obligation to locate such holders whose distributions or notices are properly mailed but nevertheless returned.

(b)    Form of Distributions. Any payment of Cash made by the Reorganized Debtor pursuant to the Plan shall be made by check; provided, however, that after the occurrence of the Effective Date, the Reorganized Debtor is not obligated to make any Cash payment under the Plan unless the payment exceeds ten dollars ($10); provided, further, that Cash equal to 100% of the distributions to which the holder of a Claim would be entitled under the Plan if the payment to such holder was less than or equal to ten dollars ($10) shall be maintained in a reserve (the "Small Payment Reserve") for the benefit of such holder until an aggregate of at least ten dollars is payable to such holder and at such time the holder shall receive a payment equal to 100% of the distributions to which it would otherwise be entitled.

(c)    Distributions to be on Business Days. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

(d)    Distributions to Holders as of the Distribution Record Date. As of the close of business on the Distribution Record Date, the claims register shall be closed. The Reorganized Debtor shall have no obligation to recognize any transfer of any Claims occurring after the close of business on the Distribution Record Date, and shall instead be entitled to recognize and deal for all purposes under the Plan with only those holders of record as of the close of business on the Distribution Record Date.

**6.2    Objections to Disputed Claims.** Any objections to Claims against the Estate may be prosecuted by the Reorganized Debtor, or any other party in interest.

Except as otherwise provided by order of the Bankruptcy Court, the Reorganized Debtor, or any other party in interest may file an objection to any Claim until 180 days after the Effective Date.

**6.3    Estimation of Claims.** The Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall have jurisdiction to estimate such Claim at any time, including, without limitation, during litigation concerning such Claim or an objection to such Claim. The Reorganized Debtor shall be entitled to request that the Bankruptcy Court determine either the Allowed amount of such Claim or a maximum limitation on such Claim. If the Bankruptcy Court determines the maximum limitation of such Claim, such determination shall not preclude the Reorganized Debtor from pursuing any additional proceedings to object to any ultimate payment of such Claim. If the Bankruptcy Court determines the Allowed amount of such Claim, the amount so determined shall be deemed the amount of the Disputed Claim for all purposes under this Plan. All such proceedings are cumulative and not exclusive remedies.

**6.4    Disputed Claims Reserve.**

(a)    Establishment. The Reorganized Debtor shall maintain a reserve (the "Disputed Claims Reserve") equal to 100% of the distributions to which holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims or such lesser amount as required by a Final Order.

(b)    Distributions Upon Allowance of Disputed Claims. The holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Initial Distribution Date shall receive distributions of Cash from the Disputed Claims Reserve as soon as practical following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order. Such distributions shall be made in accordance with the Plan based upon the distributions that would have been made to such holder under the Plan if the Disputed Claim had been an Allowed Claim on or prior to the Initial Distribution Date. No holder of a Disputed Claim shall have any claim against the Disputed Claims Reserve or the Reorganized Debtor with respect to such Claim until such Disputed Claim shall become an Allowed Claim, and no holder of a Disputed Claim shall have any right to interest on such Disputed Claim.

**6.5    Reversion of Unclaimed Checks and Disputed Claims Reserve.** The following amounts shall revert and be vested in the Estate free and clear of any claim or interest of any holder of a Claim under the Plan: (i) the amount of any checks issued for distributions under the Plan that remain uncashed for a period of one year after the date of such distribution, and (ii) to the extent that a Disputed Claim is not Allowed or becomes an Allowed Claim in an amount less than the Disputed Claim Amount, the excess of the amount of Cash in the Disputed Claims Reserve attributable to such Disputed Claim over the amount of Cash actually distributed on account of such Disputed Claim.

**6.6** **Retention and Preservation of Claim Objections and Causes of Action.**

Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code,  upon entry of the Confirmation Order, the Reorganized Debtor's rights to object to all Claims and Interests asserted against the Estates and all of the Debtors' or Estates' Causes of Action, including without limitation: (1) all Claims and Causes of Action disclosed in the accompanying Disclosure Statement, including Claims against the Bank, if the Bank opposes this Plan; (2) preference actions under Section 547 of the Bankruptcy Code; (3) Causes of Action asserted in any adversary proceeding which is pending as of the Confirmation Date; (4) all Claims and Causes of Action disclosed in the Schedules which are incorporated herein by reference; and (5) any and all other Claims and Causes of Action that the Debtors hold preconfirmation, including, but not limited to, Claims for unpaid accounts receivable and fraudulent transfer, shall vest in the Estate.

Unless a Claim or Cause of Action against any Person is expressly waived or released in the Plan or any Final Order of the Bankruptcy Court, the Estates expressly reserve such Claim or Cause of Action for later adjudication (including without limitation, Claims and Causes of Action not specifically identified or which the Reorganized Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Reorganized Debtor at this time or facts and circumstances which may change or be different from those which the Reorganized Debtor now believe to exist) and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claims preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Causes of Action upon or after the confirmation or consummation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except where such Claims or Causes of Action have been expressly released in the Plan or any other Final Order of the Bankruptcy Court.

## ARTICLE VIII

## VOTING ON THE PLAN

**7.1** **Voting of Claims**.  Each holder of an Allowed Claim in an impaired Class which retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan and indicate such vote on a duly executed and delivered ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

**7.2** **Nonconsensual Confirmation**.  If any impaired Class entitled to vote shall not accept the Plan by the requisite statutory majorities provided in Sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, or if any impaired class is deemed to have rejected the Plan, the Debtors reserve the right (i) to confirm the Plan

under Section 1129(b) of the Bankruptcy Code, and (ii) to amend the Plan in accordance with Section 11.6 hereof to the extent necessary to obtain entry of a Confirmation Order.

## ARTICLE VIII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**8.1    Executory Contracts and Unexpired Leases**.  On the Effective Date, all executory contracts and unexpired leases to which the Debtors are a party shall be deemed assumed as of the Effective Date, except for an executory contract or unexpired lease that (i) has been assumed or rejected pursuant to a Final Order of the Bankruptcy Court entered before the Effective Date or (ii) is the subject of a separate motion to reject filed under Section 365 of the Bankruptcy Code by the Debtors before the Effective Date.

**8.2    Approval of Assumption of Executory Contracts and Unexpired Leases**.  Entry of the Confirmation Order shall constitute the approval, pursuant to Section 365(a) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed as of the Effective Date of the Plan.

**8.3    Cure Claims**.  The Debtors shall file with the Bankruptcy Court, and serve upon all counterparties to executory contracts to be assumed pursuant to this Article, not later than thirty days before the Confirmation Date.  The counterparties to such executory contracts may file any objections to the Debtors' proposed cure amounts, which objections must state with specificity the basis for any objection, including the counterparties' proposed cure amount, any documentary evidence supporting the objection, and a detailed basis for the objection, not later than fifteen days before the Confirmation Date.  The Bankruptcy Court shall determine any disputes concerning cure claims at the confirmation hearing.

## ARTICLE IX

## CONDITIONS PRECEDENT TO EFFECTIVE DATE

**9.1    Conditions Precedent to Effectiveness**.  The Plan shall not become effective, and the Effective Date shall not occur, unless and until the following conditions shall have been satisfied or waived:

(a)    the Confirmation Order, in form and substance reasonably acceptable to the Debtors, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

(b)     all actions, other documents and agreements necessary to implement the Plan shall have been executed, delivered and, if necessary, properly recorded, and shall have become effective;

(c)     the Estates shall have sufficient Cash to meet all Cash funding obligations under the Plan required to be made on the Effective Date and the Initial Distribution Date.

**9.2     Failure of Conditions Precedent**.  Notwithstanding anything in this Plan to the contrary, the conditions set forth in Section 9.1 above must be satisfied or waived on or before January 15, 2011.  In the event that the conditions set forth in Section 9.1 above are not satisfied on or before January 15, 2011, then the Plan shall be deemed revoked and withdrawn, the Confirmation Order shall be deemed vacated, and Section 11.8 of the Plan shall apply.

**9.3     Waiver of Conditions**.  The Debtors may waive one or more of the conditions precedent to the effectiveness of the Plan set forth in Section 9.1 above, except that the Debtors may not waive the condition that the Estates will have sufficient Cash to meet all payment and funding obligations under the Plan on the Effective Date and the Initial Distribution Date.

## ARTICLE X

## RETENTION OF JURISDICTION

**10.1     Retention of Jurisdiction**.  After the Effective Date, the Bankruptcy Court shall have exclusive jurisdiction of the following specified matters arising out of, and related to, the Bankruptcy Cases and the Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code:

(a)     to hear and determine any and all objections to the allowance of any Claims or any controversies as to the classification of any Claims or estimate any Disputed Claim;

(b)     to hear and determine any and all applications by Professionals for compensation and reimbursement of expenses;

(c)     to hear and determine any and all pending applications for the rejection or assumption of executory contracts and unexpired leases, and fix and allow any Claims resulting therefrom;

(d)     to enforce the provisions of the Plan subject to the terms thereof;

(e)     to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purpose and the intent of the Plan;

(f)     to determine any Claim or liability to a Governmental Unit which may be asserted as a result of the transactions contemplated herein;

(g)     to hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code; and

(h)     to determine such other matters as may be provided for in the Confirmation Order.

## ARTICLE XI

## MISCELLANEOUS

**11.1   Continuation of Injunctions or Stays Until Effective Date**.  All injunctions or stays provided for in the Bankruptcy Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**11.2   Injunction Relating to the Plan**.  As of the Effective Date, all Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Reorganized Debtor, the Debtors or their Estates, on account of, or respecting any Claims, debts, rights, Causes of Action or liabilities discharged or treated pursuant to the Plan, except to the extent expressly permitted under the Plan. Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present, future, or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

**11.3   Bar Date for Administrative Claims**.  All applications for allowance of Administrative Claims other than (a) fees and expenses of Professionals Allowed pursuant to an Order of the Bankruptcy Court, and (b) fees and charges assessed against the Estates pursuant to 28 U.S.C. § 1930, shall be filed not later than thirty days after the Effective Date.  All Administrative Claims not filed within thirty days after the Effective Date shall be barred.  The deadline in the preceding sentence shall be construed and have the same force and effect as a statute of limitations.  The Reorganized Debtor shall provide notice to all creditors listed on the mailing matrix of this bar date within ten days after the Effective Date.  The Bankruptcy Court shall determine all Administrative Claims.

**11.4   Default of Plan**.  In the event of any default of the provisions of this Plan, a creditor or party in interest aggrieved by such default may provide written notice to the Reorganized Debtor.  The notice of default must describe with specificity the nature of the default alleged and the steps required to cure such default.  The Reorganized Debtor shall have thirty days after receipt of notice of default to cure such default.  If the default is not cured within thirty days after receipt of a notice of default,

then a creditor or party in interest aggrieved by such default may apply to the Bankruptcy Court to compel compliance with the applicable provisions of the Plan. The Bankruptcy Court, after notice and a hearing, shall determine whether a default occurred, and if a default occurred, whether such default has been cured. Upon finding a material default, the Bankruptcy Court may issue such orders as may be appropriate, including an order compelling compliance with the pertinent provisions of the Plan.

**11.5   Setoffs**. Except as otherwise provided in this Plan, nothing contained in this Plan shall constitute a waiver or release by the Estates of any rights of setoff the Estates may have against any Person.

**11.6   Amendment or Modification of the Plan**. Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified, satisfies the conditions of Sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with Section 1125 of the Bankruptcy Code. The Plan may be altered, amended or modified at any time before or after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under Section 1129 of the Bankruptcy Code. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder. The Debtors may, without notice to holders of Claims insofar as it does not materially and adversely affect the interests of any such holders, correct any defect or omission in this Plan and any exhibit hereto.

**11.7   Severability**. If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court may, upon the request of the Debtors, alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alternation or interpretation. The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable according to its terms.

**11.8   Revocation or Withdrawal of the Plan**. The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a

waiver or release of any Claims by or against the Estates or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Estates.

**11.9   Binding Effect**.  The rights, duties and obligations of any Person named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.

**11.10   Notices**.  All notices, requests and demands to or upon the Reorganized Debtor shall only be effective if in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and confirmed, addressed as follows:

If to the Reorganized Debtor:

Harbor Real Asset Fund
7659 South Main Street
Midvale, Utah 84047
Tel: (801) 208-3701
Fax: (801) 208-3705

with a copy to:

George Hofmann
Parsons Kinghorn Harris
111 East Broadway, 11th Floor
Salt Lake City, Utah 84111
Tel: (801) 363-4300
Fax: (801) 363-4378

**11.13   Governing Law**.  Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Utah, without giving effect to the principles of conflicts of law of such jurisdiction.

**11.14   Post-Confirmation Fees**.  The Reorganized Debtor shall be responsible for the payment of any post-confirmation fees due pursuant to 28 U.S.C. §1930 and the filing of post-confirmation reports, until a final decree is entered.

**11.15 <u>Final Decree</u>**. Upon indefeasible payment in full of all Claims in Classes 1-17 of this Plan, the Reorganized Debtor shall apply to the Court for a final decree in the Bankruptcy Cases. Upon entry of a final decree, all remaining assets of the Estates shall vest in the Reorganized Debtor free and clear of any Liens or Claims treated or provided for under this Plan, and the Debtor may operate its business free of any constraints or obligations under this Plan.

**11.16 <u>Headings</u>**. Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

**11.17 <u>Filing of Additional Documents</u>**. On or before substantial consummation of the Plan, Debtors or the Reorganized Debtor shall file with the Bankruptcy Court any agreements or other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**11.18 <u>Inconsistency</u>**. In the event of any inconsistency between the Plan and the Disclosure Statement, or any other instrument or document created or executed pursuant to the Plan, the terms of the Plan shall govern.

Dated: September 10, 2010

PARSONS KINGHORN HARRIS
*A Professional Corporation*


 /s/  George Hofmann
GEORGE B. HOFMANN
Matthew M. Boley
Steven C. Strong
Proposed Attorneys for the Debtors

# EXHIBIT B

| Property Description | Pre-Confirmation Proceeds | Initial Sales Period Proceeds | Final Sales Period Proceeds | Chapter 7 Liquidation Proceeds |
|---|---|---|---|---|
| Stoney Creek Condos | $1,000,000.00 | | | $300,000.00 |
| Deer Canyon Preserve | $1,200,000.00 | $1,200,000.00 | | $500,000.00 |
| Blackridge Commercial | $3,000,000.00 | | $3,000,000.00 | $1,500,000.00 |
| Promontory Club | $2,200,000.00 | $1,600,000.00 | | $1,500,000.00 |
| Andalusia Residential Subdivision | $2,500,000.00 | $859,900.00 | $600,000.00 | $1,500,000.00 |
| Bogus Basin Condos | $2,000,000.00 | $331,875.00 | $400,000.00 | $1,000,000.00 |
| Powder Mountain Condominiums | | $420,000.00 | | $1,000,000.00 |
| Sleepy Ridge Golf Course Residential | $3,000,000.00 | | $3,000,000.00 | $750,000.00 |
| | $1,400,000.00 | $895,896.00 | | $895,896.00 |
| Southgate Townhomes | $700,000.00 | | $700,000.00 | $350,000.00 |
| R&M Office Building | $150,000.00 | | $150,000.00 | $150,000.00 |
| Haven Estates | $2,500,000.00 | $1,000,000.00 | $1,200,000.00 | $1,300,000.00 |
| Makaha Beach lot | $180,000.00 | | $180,000.00 | $130,000.00 |
| Copper SFR (Canyon Vine) | $1,205,000.00 | $990,630.00 | | $990,630.00 |
| Cedar Valley Acres | | | | |
| Royal Point Residential | $1,000,000.00 | $1,000,000.00 | | $400,000.00 |
| De Colonia Residential | $160,000.00 | | $190,000.00 | $125,000.00 |
| | | $8,130,000.00 | $8,390,000.00 | $11,391,526.00 |
| Cash on hand (beginning) | $3,498,301.00 | $88,000 | $4,867.00 | $100,000.00 |
| Trustee Fees (including professional fees) | $100,000.00 | $100,000.00 | $50,000.00 | $397,996.00 |
| Class 1 | | $100,000.00 | $100,000.00 | $250,000.00 |
| Class 2 | $3,148,470.00 | $7,751,530.00 | | $10,160,278.00 |
| Class 3 | $86,568.00 | | | $85,568.00 |
| Class 4 | $24,380.52 | | | $24,380.52 |
| Class 5 | $93,015.62 | | | $93,015.62 |
| Class 6 | | | $4,000.00 | $4,000.00 |
| Class 7 | | | $70,000.00 | $120,000.00 |
| Class 8 | $116,000.00 | | $50,000.00 | $101,160.96 |
| Class 9 | | | | $115,127.00 |
| Class 10 | | | $115,127.00 | $53,000.00 |
| Class 11 | $5,000.00 | | $53,000.00 | $18,000.00 |
| Class 12 | | | $22,500.00 | $5,000.00 |
| Class 13 | | | | $63,000.00 |
| Class 14 | | | $63,000.00 | $200,000.00 |
| Class 15 | | | $200,000.00 | $550,000.00 |
| Class 16 | $8,000.00 | | | |
| Class 17 | | | $550,000.00 | |
| Class 18 | | | | |
| Class 19 | | | | |
| **Totals Claims Paid:** | $3,581,434.14 | $8,103,657.00 | $925,500.00 | |