George Hofmann (10005)
Matthew M. Boley (8536)
Steven C. Strong (6340)
**Parsons Kinghorn Harris**
A Professional Corporation
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
Telephone: (801) 363-4300
Facsimile: (801) 363-4378

Attorneys for Debtor-in-Possession
HRAF HOLDINGS, LLC

Michael R. Johnson (7070)
**Ray Quinney & Nebeker P.C.**
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, UT 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: mjohnson@rqn.com

Proposed Attorneys for
Debtor-in-Possession Harbor
Real Asset Fund, LP

**IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| In re<br><br>HRAF HOLDINGS, LLC,<br><br>Debtor. | Bankruptcy No. 10-32433 (RKM)<br><br>Chapter 11<br><br>[Filed Electronically] |
| In re<br><br>HARBOR REAL ASSET FUND, LP,<br><br>Debtor. | Bankruptcy No. 10-32436 (RKM)<br><br>Chapter 11<br><br>[Filed Electronically] |

**REPLY IN SUPPORT OF
DEBTORS' MOTION TO APPROVE DISCLOSURE STATEMENT**

HRAF HOLDINGS, LLC and HARBOR REAL ASSET FUND, LP, debtors and debtors-in-possession (the "**Debtors**") in the above-captioned jointly administered and procedurally consolidated case (the "**Case**"), jointly submit this reply memorandum in further support of their motion [Docket No. 15] (the "**Motion**") for, among other things,

approval of their proposed disclosure statement (the "**Disclosure Statement**"). The Debtors further move the Court to approve the Disclosure Statement, subject to such revisions and supplementations as the Court may approve or direct, as containing "adequate information" within the meaning of 11 U.S.C. § 1125, and to authorize the Debtors to thereafter solicit acceptances of their bankruptcy plan in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules and applicable orders of the Court.

## I. INTRODUCTION

The Debtors filed their Motion to approve the Disclosure Statement on September 10, 2010. The Debtors provided notice of the Motion, of the hearing thereon, and of the deadline to object thereto on that same day to all persons entitled to notice. [Docket No. 16] Only two objections to the Motion were filed. The first was filed by Bank of America, N.A. ("**BofA**" or the "**bank**"). [Docket No. 41] The second was filed by the Office of the United States Trustee (the "**UST**"). [Docket No. 44] Both objections are addressed herein. For the reasons set forth below, some of the objections raised by BofA and the UST are without merit, and they simply should be overruled. Other of the objections have been dealt with by the Debtors' agreement to modify the Disclosure Statement in the manner suggested below. With those voluntary modifications (and any other modifications directed by the Court at the hearing) the Court should approve the Disclosure Statement as containing adequate information, and authorize the Debtors to seek acceptances of their plan.

## II. REPLY TO BANK OF AMERICA'S OBJECTIONS

### A. The Liquidation Analysis Is Adequate

BofA argues that the Disclosure Statement should contain separate liquidation analyses for each debtor. As the Disclosure Statement explains, debtor HRAF

1109307                                       2

Holdings, LLC ("**HRAF**") holds all real property and other assets of the Debtors. The sole asset of debtor Harbor Real Asset Fund, LP ("**Harbor**") is its equity ownership of HRAF. HRAF acquired all of its property and assets through a wholesale transfer from Harbor to HRAF, which was done at the insistence of BofA. The only consideration that HRAF received in exchange for the transfers was the membership interest in HRAF.

    1.    <u>There is no need for separate liquidation analyses</u>.

In light of the economic structure of the two Debtors, it is unnecessary to provide separate liquidation analyses. BofA certainly does not need additional or better information, and other creditors would be no more informed by two liquidation analyses than they are by the liquidation analysis and explanation provided in the Disclosure Statement.

    2.    <u>The Disclosure Statement adequately discloses liens against the Debtors' real property</u>.

BofA complains that the Disclosure Statement does not adequately disclose the ad valorem tax liens, homeowners' association liens and mechanic's liens against the properties. The Debtor submits that the Disclosure Statement adequately discloses the existence and amount of such liens. To the extent the Court believes otherwise, the Debtor asks the Court to approve the Disclosure Statement subject to such supplementation in this regard as the Court directs.

**B.    The Disclosure Statement Provides Adequate Information Regarding the Participation Interests.**

As the proposed Disclosure Statement explains, several of the loans held by the Debtors were jointly owned along with third party "participants." Although Harbor was appointed by agreement to act as the lead bank and to service the loans on behalf of all participants, Harbor (and later HRAF) was only a part owner of the loans. Later, when the jointly owned loans went into default and the notes were foreclosed, Harbor

acquired title to the real property collateral for the loans as the agent and nominee for the group of participants.  The percentage ownership that Harbor and the group of participants had and have in the real property mirrors their percentage ownership in the underlying loans.  For example, if Harbor owned 50% of a loan and another party owned the other 50% of the loan, those same percentages were applied to ownership of the foreclosed upon real property collateral.

BofA had actual knowledge of these participation interests at the time it entered into its credit relationship with Harbor, and entered into a written agreement with at least one of the loan participants.[1]  Further, prior to its objection to the Disclosure Statement, the bank consistently has acknowledged and honored the rights of the co-owners, and never has argued that their rights were prejudiced by transfer of assets from Harbor to HRAF which was done at the bank's insistence.  Thus, it is interesting that the bank would demand further "disclosure" of the various participation loans.  BofA has known all of the details of the transaction for a substantial period of time.  Moreover, as discussed below, BofA's request for further disclosure regarding these loans is without merit.

       1.    <u>The information contained in the Disclosure Statement is sufficient and reasonably calculated to permit creditors to make an informed judgment regarding the Plan</u>.

BofA's objection is nothing more than subterfuge and obfuscation.  The bank has had actual knowledge of the Debtors' agreements with the loan participants since before entering its credit relationship with the Debtors.  Further, the bank has copies of all applicable participation agreements.  There is nothing that the Debtors could say in the Disclosure Statement about these matters that the bank does not already know.

---

[1] A true and correct copy of the *Intercreditor Agreement* between BofA and Harbor Offshore Real Asset Fund, Ltd. ("**HORAF**") is attached as **Exhibit "A"**.

**1109307**            4

The Disclosure Statement provides adequate information regarding the participation agreements.  There should be, and is, no requirement that the Debtor must include copies of all relevant documents governing its relationships with all creditors and parties-in-interest in its disclosure statement.  If it did, the Disclosure Statement would be thousands or tens of thousands of pages in length.  In fact, it would be so lengthy that it is unlikely that anyone would ever read it.

Nonetheless, to the extent the Court believes further disclosure may be helpful, the Debtors would, at the Court's direction, add a statement to the Disclosure Statement substantially as follows:

> All of the property now owned by the Debtors was acquired through foreclosure, deed-in-lieu transfers or other actions to realize upon collateral for loans of which Harbor was the owner or servicer.  Some of these loans were not owned wholly by Harbor, but were instead co-owned by Harbor and other creditors pursuant to written loan participation agreements.  Harbor, however, acted as the "lead bank" and serviced the loans as agent and collateral agent for these "loan participants."

> When Harbor realized upon the real property that served as collateral for these "participation loans," Harbor acquired title as agent and nominee for the co-owners.  In short, HRAF acquired mere legal title to the properties with respect to those portions of the properties owned by the loan participants, whereas the loan participants held and continue to hold equitable ownership of the property according to the percentage ownership they held in the underlying loans.  Moreover, while Harbor thereafter transferred its interest in the properties to HRAF, the interest that was transferred to HRAF was the exact same interest that Harbor held.  Harbor could not transfer to HRAF a greater interest than it had.  Pursuant to section 541(d) of the Bankruptcy Code, these properties became property of HRAF's chapter 11 bankruptcy estate only to the extent of its legal title to such property, but not to the extent of the equitable interest in such property owned by the loan participants.  The Debtors' schedules and the liquidation analyses provided with this Disclosure Statement reflect the Debtor's limited/partial ownership of certain parcels of real property.

> Bank of America, N.A. has taken the position that the equitable interests of the loan participants are avoidable under section 544(a) of the Bankruptcy Code. The Debtors' do not share the bank's view. Moreover, the Debtors believe that Bank of America, N.A. is estopped from claiming that these equitable interests are "avoidable," because the bank knew of, consented to and recognized the equitable interests of the participants prior to the filing of this bankruptcy case. In any event, because the Plan proposes full repayment to creditors, the Debtors believe it would be a waste of party and judicial resources to investigate or prosecute avoidance claims against the "loan participants."

Even without this supplementation, the Disclosure Statement contains "adequate information." With this supplementation, the Disclosure Statement will provide more than sufficient information to permit creditors to make an informed judgment regarding the Plan.

      2.    <u>HRAF acquired certain properties subject to participation interests</u>.

BofA also contends that the ownership rights of the loan participants (the "**Participation Interests**") were "cut off" when Harbor conveyed the real properties and notes to HRAF. Essentially, BofA argues that the Participation Interests did not "survive" the conveyance because the Special Warranty Deed between Harbor and HRAF did not mention the Participation Interests and notice of the Participation Interests were not recorded.

It goes without saying that a party cannot transfer more than the party has in the first place. <u>See, e.g.</u>, <u>Wykoff v. Barton</u>, 646 P.2d 756, 758 n.1 (1982); <u>Evona Inv. Co. v. Brummitt</u>, 66 Utah 82, 95, 240 P. 1105, 1110 (1925); <u>Moyle v. Thomas</u>, 46 Utah 542, 549-50, 151 P. 361, 364 (1915) ("In fact, neither of the heirs could convey more than he had, and therefore the amounts in excess of what they owned as described in their deeds is without any force or effect, at least in so far as this case is concerned."). Thus, it would have been impossible for Harbor to transfer the Participants' equitable interests in the loans and properties to HRAF, because Harbor never owned them in the first

**1109307**                                                          6

place. Moreover, Utah's Recording Act does not "affect the validity of a document with respect to the parties to the document and *all other persons who have notice of the document*." Utah Code Ann. § 57-3-102(3) (West) (emphasis added). Therefore, "unrecorded documents affecting real property are enforceable as against persons with 'actual notice.'" Diversified Equities, Inc. v. American Sav. Loan Assoc., 739 P.2d 1133, 1136 (Utah App. 1987). Personal knowledge of an unrecorded document affecting real property is "actual notice." Id.

Here, HRAF and BofA had actual notice of the Participation Interests. Indeed, as reflected in Exhibit "A", BofA acknowledged and agreed to honor the Participation Interests. Harbor held the properties subject to the Participation Interests, and HRAF took the properties *cum onere*. In other words, HRAF acquired legal title to the property subject to the Participation Interests and acquired no better title that Harbor, the transferor, had held.

   3. <u>HRAF does not have the right to avoid the participation interests</u>.

BofA contends that HRAF can and should avoid the Participation Interests under the "strong-arm" powers arising under section 544(a)(3) of the Bankruptcy Code. BofA, however, does not explain the grounds for avoidance in this jointly administered Case. As described above, the bankruptcy estate's interest in the properties subject to the Participation Interests expressly is circumscribed under section 541(d) of the Bankruptcy Code. This statute provides:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, *such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest*, becomes property of the estate ... only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

**1109307**               7

11 U.S.C. § 541(d) (emphasis added).  Ironically, the language of the statute addresses the very issue being raised by BofA, and makes clear that BofA's arguments in this regard are without merit.  Each of the Participation Interests is an "interest in … a mortgage, sold by the debtor [in part] but as to which the debtor retain[ed] legal title to service or supervise the servicing of such mortgage or interest."

Contrary to the bank's suggestion, section 544(a) of the Bankruptcy Code does not expand the property of the Bankruptcy Estate.  It does not give the estate the power to steal someone else's property, or to re-write historical fact.  Rather, section 544(a) governs the rights of a trustee or debtor-in-possession, under limited circumstances, to "avoid any transfer of property of the debtor or any obligation incurred by the debtor …."  In short, it does not override the limits prescribed under section 541(d).  Moreover, the statute makes clear that a condition precedent to an avoidance action is that the transfer be "of property of the debtor."  If property of the debtor was never transferred in the first place, then there is simply nothing to avoid.  To hold otherwise would be to read section 541(d) out of the Bankruptcy Code.

The Participation Interests (i.e., the equitable interests of the loan participants in real property and/or mortgages held by HRAF) are excluded from HRAF's bankruptcy estate, and are not subject to avoidance under section 544(a)(3). See In re Mill Concepts Corp., 123 B.R. 938, 944-947 (Bankr. D. Mass. 1991) (analyzing express language and legislative history of § 544(a)(3) as inapplicable to equitable interests under § 541(d)); In re McCann, 318 B.R. 276, 284-285 (Bankr. S.D.N.Y. 2004) (concluding that pre-bankruptcy equitable interest was outside the scope of § 544(a)(3) avoidance powers).  Therefore, requiring the Debtors to add disclosure about the strong-arm powers would be confusing and illogical.  Such claims simply do not exist.

    4.    <u>The alleged avoidability of the Participation Interests also is mooted by the full repayment afforded to creditors under the Plan</u>.

The Plan contemplates and provides for full repayment to all creditors. As such, the potential avoidability of the Participation Interest, as argued by BofA, also is moot. Assuming for the sake of argument that the Participation Interests were potentially avoidable, the consequence of an avoidance action would be (a) a substantial increase in the legal expenses and other administrative costs of the estate, (b) a delay in the Debtor's ability to liquidate the properties and/or the sales proceeds while avoidance litigation was pending, and (c) resulting unsecured claims by the holders of the Participation Interests as against HRAF. <u>See, e.g.,</u> 11 U.S.C. § 502(h). Because the Plan contemplates full payment to all creditors, those resulting unsecured claims would be paid in full. In short, even if possible, avoiding the Participation Interests would increase costs, delay the administration of the estate, and would net the bankruptcy estate no benefit. As such, the issue is moot.

**C.**    **The Bankruptcy Code Does Not Require a "Reorganization Budget."**

A "reorganization budget" is not required under sections 1125 or 1129 of the Bankruptcy Code. BofA is asking the Court to afford it protections as if it holds an interest in "cash collateral," but it does not. The bank is a mere unsecured creditor of HRAF. Further, because the Plan provides full repayment to BofA before any repayment to creditors of Harbor, its alleged lien rights in distributions from HRAF to Harbor never comes into play.

Notwithstanding that fact, the bank argues that the Disclosure Statement is inadequate because it does not describe "the order in which properties will be sold." This information is not included because the Debtors do not know in what order the properties will sell, and do not propose to circumscribe their ability to sell properties according to some preconceived limits. The properties will be sold according to the

**1109307**    9

order in which HRAF, as determined by its business judgment, receives an offer to purchase for a fair and reasonable price.

The bank argues that HRAF must disclose its operating and carrying costs. To be sure, there will be legal expenses, accounting expenses, costs of maintaining properties, and other administrative expenses. The precise amount of those expenses is unknown. A budget for such expenses is not necessary for creditors to make an informed decision regarding the Plan.

The bank also argues that there is no description of the amounts that will be paid on secured claims, closing costs and commissions. These amounts are unknown and are subject to change depending upon (a) how much time passes, (b) the agreed sales price, and (c) the other terms and conditions of sale. That being said, the Debtors would propose to payoff valid secured claims from the sales proceeds, as well as closing costs and commissions in amounts that are usual and customary in the industry.

### D. The Description and Explanation of the Relationship Between the Debtors is Adequate.

The Disclosure Statement explains the creation of HRAF and the transfer of all or substantially all of Harbor's assets to HRAF. BofA cannot reasonably complain that it is misled. It understands the relevant facts at least as well as the Debtors, because it is the one who required that these transactions take place to begin with.

Indeed, if the information contained in the Disclosure Statement is lacking in any regard, it is only in the potential that creditors of Harbor (other than BofA) might claim to be creditors of HRAF under theories, among others, of alter ego, successor liability and fraudulent transfer. The Debtor asks the Court to approve the Disclosure Statement subject to such supplementation in this regard as the Court directs.

> E. **The Disclosure Statement Provides Adequate Information Regarding the Forbearance Agreement.**

BofA argues that the Disclosure Statement is inadequate because it does not recite BofA's beliefs and point of view regarding the pre-petition credit relationship. The bank has knowledge at least equal to that of the Debtor regarding the Forbearance Agreement and the parties' credit relationship. As to other creditors, the discussion of the Forbearance Agreement contained in the Disclosure Statement is adequate to permit them to make an informed decision regarding the Plan.

> F. **The Disclosure Statement Adequately Explains the Payment of Unsecured Claims.**

BofA argues that the Disclosure Statement does not explain how "convenience claims" will be paid. This information, however, is provided in the Plan. There is no requirement that the Disclosure Statement must contain and repeat all information contained in the Plan itself. This would be wasteful and is unnecessary. That being said, if the Court desires that the language of the Plan regarding the payment to convenience claims be repeated in the Disclosure Statement, the Debtors are happy to make that change.

> G. **The Debtor Will Correct Any Inaccuracies as to Dollar Amounts.**

The Debtor will correct any inaccuracies regarding the amount of sale proceeds based upon sales for which Court approval has been sought or obtained at the time the Disclosure Statement is disseminated.

> H. **The Disclosure Statement Provides Adequate Information Regarding the Debtor's Claims Against BofA.**

BofA seeks to hold the Disclosure Statement's discussion of the Debtors' potential claims against the bank to a Rule 12(b)(6) standard. The brief summary and explanation of the Debtors' claims against BofA, however, are not intended to constitute a complaint and are not subject to a pleading standard. The information provided is

more than adequate to permit creditors to make an informed decision regarding the Plan.

### I. The Disclosure Statement and Plan Provide Adequate Information Regarding the Treatment of BofA's Claim.

The Plan proposes to pay BofA's claim in full in such amount as the Court may allow from a liquidation of HRAF's real property. The claim itself is disputed. The Debtors believe BofA's claim to be an unsecured claim as against HRAF. The Plan, however, affords the flexibility to pay interest and attorneys' fees on the claim as a secured claim if the Court allows such as part of the Bank's claim under section 506(b).

Further, there is no ambiguity regarding the proposed interest rate. To avoid confusion and potential inconsistency, the Disclosure Statement is silent regarding interest rates. This permits BofA and other creditors to refer to the Plan itself, wherein the treatment of their claims is described. As BofA acknowledges in the objection, the Debtors propose to pay interest at the rate prescribed under 28 U.S.C. § 1961. There is no inadequacy of information or ambiguity.

### II. REPLY TO THE US TRUSTEE'S OBJECTIONS

#### A. The Debtors are Willing to Provide a Summary Explanation of the Basis for Certain Disputed Claims.

While the Debtors believe it unnecessary, to the extent the Court disagrees the Debtors are willing to provide further information regarding the legal and/or factual bases upon which they dispute the claims of Clark Real Estate, High Country Roofing and Salt Lake Sand and Gravel. Further, if the Court deems it necessary, the Debtors are willing to explain that "the outcome of these disputes is uncertain, and the Debtors are unable to provide any forecast as to the likelihood that the claims will be disallowed." The Debtors ask the Court to approve the Disclosure Statement subject to such supplementation in this regard as the Court directs.

**B.    The Debtors Are Willing to Explain the Bases for the Property Values Contained in the Disclosure Statement.**

The Debtors are willing to supplement the Disclosure Statement to explain that the values are based upon the Debtors' business judgment, as informed by (a) the Debtors' experience and familiarity with the properties and the applicable real estate markets, and (b) the advice and input of the professional real estate brokers the Debtors have employed to sell the properties.  Further, now that the Debtors have obtained the appraisals performed by BofA, they are willing to further supplement the Disclosure Statement to include the appraised values where available.  The Debtors ask the Court to approve the Disclosure Statement subject to such supplementation in this regard as the Court directs.

**C.    The Debtors Are Willing to Provide Further Explanation Regarding Personal Property.**

The Debtors are willing to explain that they intend to pursue foreclosure of the real property located in Iron County as soon as practicable.  The Debtors further are willing to provide identification of the guarantors and the guaranty amounts, although they believe that such information is unnecessary as the Plan is a full-payment plan and the Debtors are not counting on the strength of the guarantees to make payments to creditors.  The Debtors ask the Court to approve the Disclosure Statement subject to such supplementation in this regard as the Court directs.

**D.    The Debtors Are Willing to Explain Why an Orderly Liquidation under Chapter 11 Is Preferable to Chapter 7.**

The Debtors are willing to supplement the Disclosure Statement to explain the reasons why the Debtors believe creditors will be better served by an orderly liquidation under chapter 11 than by liquidation under Chapter 7.  The Debtors ask the Court to approve the Disclosure Statement subject to such supplementation in this regard as the Court directs.

### E. The Debtors Are Not Required to Provide Creditors With Legal Advice.

The US Trustee expresses concern that the Disclosure Statement does not explain the absolute priority rule, and does not advise unsecured creditors of potential grounds to object to confirmation. The Disclosure Statement requirements under chapter 11 were not intended or designed to place on debtors or their counsel an obligation to provide legal advice to creditors.

### F. The Debtors will Amend the Disclosure Statement to Disclose the Separate Retention of Ray Quinney & Nebeker as Proposed Counsel for Harbor.

The Debtors are happy to disclose that HRAF and Harbor are represented by separate counsel in the Case, and to identify the name of the law firms who are representing them. The Debtors believe that further discussion in this area, however, such as the reasons why the Court directed the retention of separate counsel, is unhelpful and unnecessary.

DATED this 22nd day of October, 2010.

**PARSONS KINGHORN HARRIS**

/s/  Matthew M. Boley
Matthew M. Boley
*Attorneys for* HRAF HOLDINGS, LLC

**RAY QUINNEY & NEBEKER**

/s/  Michael R. Johnson
Michael R. Johnson
*Proposed attorneys for* HARBOR REAL ASSET FUND, LP

# CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of October, 2010 the foregoing *Reply In Support Of Debtors' Motion To Approve Disclosure Statement* was electronically filed in case no 10-32433 the and therefore served via ECF on the following:

- Matthew M. Boley -- mmb@pkhlawyers.com, dh@pkhlawyers.com
- Laurie A. Cayton tr - laurie.cayton@usdoj.gov, james.gee@usdoj.gov
- George B. Hofmann -- gbh@pkhlawyers.com, dh@pkhlawyers.com
- Vernon L. Hopkinson -- vern@crslaw.com
- David E. Leta -- dleta@swlaw.com, wsmart@swlaw.com
- Steven C. Strong -- scs@pkhlawyers.com
- United States Trustee -- USTPRegion19.SK.ECF@usdoj.gov
- Kent O. Willis -- ucadm.kentw@state.ut.us

I further certify that on the 22nd day of October, 2010, true and correct copies of the foregoing were served upon the following parties via first class mail, postage prepaid.

**George B. Hofmann**
**Matthew M. Boley**
**Steven C. Strong**
Parsons Kinghorn & Harris
111 East Broadway
11th Floor
Salt Lake City, UT 84111

**Laurie A. Cayton tr**
US Trustees Office
Ken Garff Building
405 South Main Street
Suite 300
Salt Lake City, UT 84111

**David E. Leta**
Snell & Wilmer
15 West South Temple
Suite 1200
Salt Lake City, UT 84101-1547

/s/ Sherry D. Glendening

# Exhibit "A"

**Bank of America**

## INTERCREDITOR AGREEMENT

Bank of America, N.A.
 (hereinafter called Bank)
Bay Area Strategies-Commercial Banking
315 Montgomery Street, 13th Floor
Mail Code: CAS-704-13-11
San Francisco, CA 94104-1866

Ladies and Gentlemen:

The undersigned, Harbor Offshore Real Asset Fund, Ltd., a Cayman Island Exempted Company (hereinafter referred to as "Participant") is a party to a Master Loan Participation Agreement dated as of April 11, 2007 and certain Participation Certificates related thereto (each certificate, together with the Master Loan Participation Agreement, the "Participation Agreement") with Harbor Real Asset Fund LP, a Delaware limited partnership (hereinafter referred to as "Company"). Terms used but not otherwise defined herein shall have the meanings assigned in the Participation Agreement.

Company is a party to a Credit Agreement, dated as of September 12, 2006, as amended, by and between Company and Bank (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), and Company desires that Bank extend such financial accommodations to Company as Company may request and as Bank may deem proper, whether under the Credit Agreement or otherwise. For the purpose of inducing Bank to grant, continue or renew such financial accommodations, and in consideration thereof, Participant agrees as follows:

1. Notwithstanding anything to the contrary in the Participation Agreement, at any time that any Default or Event of Default exists under the Credit Agreement (such terms to have the meanings set forth in the Credit Agreement), Participant agrees not to sue upon, or to collect or seek to collect, or to receive payment of any amount of interest owing to it under Section 3.1(c) of the Participation Agreement or other amount due it thereunder other than its Participation Percentage in Payments in accordance with Section 3.1(b) of the the Participation Agreement.

2. Bank is hereby authorized by Participant to: (a) renew, compromise, extend, accelerate or otherwise change the time of payment, or any other terms, of any existing or future claim of Bank against Company or any Borrower, (b) increase or decrease the rate of interest payable thereon or any part thereof, (c) exchange, enforce, waive or release any security therefor, (d) apply such security and direct the order or manner of sale thereof in such manner as Bank may at its discretion determine, (e) release Company or any guarantor of any indebtedness of Company or any Borrower from liability, and (f) make optional future advances to Company or any Borrower, all without notice to Participant and without affecting this Agreement.

3. Participant hereby acknowledges and consents to Bank's security interests in the Participation Agreement and the Loans subject thereto. In connection therewith, Participant consents to the transfer of all or any portion of the Participation Agreement, and Company's interest under the Participation Agreement and in the Loans subject thereto, to Bank or a purchaser or grantee in any foreclosure and sale or otherwise to any person or entity ("Person") as a part of any transfer upon and after the exercise of Bank's rights and the enforcement of its remedies under the Credit Agreement and any related security documents. Upon any such foreclosure, sale or other transfer, Participant shall recognize Bank or such other purchaser, grantee or other Person, as applicable, as a party under the Participation Agreement and as a holder of any Loan.

sf-2413842

4. Participant shall not exercise its rights and remedies against Company or any Borrower under any Loan or related security documents, or under the Participation Agreement, so long as any claim of Bank against Company shall exist.

5. Participant and Company each hereby agrees promptly to notify Bank, and in any event not later than the time it sends a notice to the other party, of any breach or default under the Participation Agreement. If so requested by Bank, Participant and Company each shall promptly also deliver duplicates or copies of all other notices delivered under or pursuant to the Participation Agreement to Bank promptly upon receipt thereof. Additionally, Participant and Company shall promptly advise Bank of any proposed material amendments or modifications to the Participation Agreement.

6. Neither Participant nor Company shall, without the prior written consent of Bank, (i) cancel or terminate the Participation Agreement, except as provided in the Participation Agreement, or consent to or accept any cancellation or termination thereof (except upon full performance of the obligations thereunder of Company), (ii) sell, assign, transfer or otherwise dispose of by operation of law the Participation Agreement or any interest therein, or (iii) amend or modify the Participation Agreement in any material respect.

7. Participant agrees that Bank shall be entitled to exercise all rights and to cure any breaches or defaults of Company under the Participation Agreement. Upon receipt of notice from Bank, Participant agrees to accept such exercise and cure by Bank and to render all performance due by it under the Participation Agreement to Bank. Each of Participant and Company agrees to make payments to be made by it under the Participation Agreement directly to Bank upon receipt of Bank's written instructions.

8. Neither Participant nor Company shall enter into any additional participation agreement with each other without first obtaining Bank's approval thereof (which approval shall not be unreasonably withheld or delayed), except for any such participation agreement on substantially similar terms as the Participation Agreement in effect as of the date hereof. Upon the effectiveness of any such additional participation agreement, such participation agreement shall be governed by the terms and conditions hereof and any references herein to the "Participation Agreement" shall mean and include a reference to such additional participation agreement.

9. In the event that any payment or any cash or noncash distribution is made to Participant in violation of the terms of this Agreement, Participant shall receive same in trust for the benefit of Bank, and shall forthwith remit it to Bank in the form in which it was received, together with such endorsements or documents as may be necessary to effectively negotiate or transfer same to Bank.

10. For violation of this Agreement, Participant shall be liable for all loss and damage sustained by Bank by reason of such breach.

11. This Agreement shall be binding upon the heirs, successors and assigns of Participant, Company and Bank. This Agreement and any existing or future claim of Bank against Company or Participant may be assigned by Bank, in whole or in part, without notice to Participant or Company.

[*Signature pages follow*]

sf-2413842

HARBOR OFFSHORE REAL ASSET FUND, LTD.

By: _____

Name: Ryan Rogers

Title: Managing Director

[Signature Page to Intercreditor Agreement]

sf-2413842

### Acceptance of Intercreditor Agreement by Company

The undersigned being the Company named in the foregoing Intercreditor Agreement, hereby accepts and consents thereto and agrees to be bound by all the provisions thereof and to recognize all priorities and other rights granted thereby to Bank of America, N.A., its successors and assigns, and to perform in accordance therewith.

Dated: 10/31, 2007

HARBOR REAL ASSET FUND LP
A Delaware limited partnership

By: HARBOR CAPITAL PARTNERS LLC
Its: General Partner
By: _____
Name: Ryan Reyea
Title: Managing Director

sf-2413842