George Hofmann (10005)
Matthew M. Boley (8536)
Steven C. Strong (6340)
**Parsons Kinghorn Harris**
A Professional Corporation
111 East Broadway, 11th Floor
Salt Lake City, Utah  84111
Telephone: (801) 363-4300
Facsimile: (801) 363-4378

Attorneys for HRAF Holdings, LLC

---

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>HRAF HOLDINGS, LLC, and<br>HARBOR REAL ASSET FUND, LP,<br><br>Debtors. | Bankruptcy No. 10-32433 (RKM)<br>Bankruptcy No. 10-32436 (RKM)<br><br>(Jointly Administered under<br>Case No. 10-32433)<br><br>Chapter 11 |

---

### MOTION FOR ORDER AUTHORIZING HRAF HOLDINGS TO SELL REAL PROPERTY (22 LOTS IN SLEEPY RIDGE SUBDIVISION) FREE AND CLEAR OF LIENS AND INTERESTS

---

Pursuant to 11 U.S.C. §§ 363(b) and (f) and Rules 6005 and 9014 of the Federal

Rules of Bankruptcy Procedure, debtor HRAF Holdings, LLC (the "**Debtor**") hereby

moves the Court for entry of an order, in the form attached hereto as Exhibit 1,

authorizing the Debtor to sell, free and clear of liens, claims and interests, that certain

real property consisting of twenty-two (22) single-family residential lots located in Phase

1 of the Sleepy Ridge Subdivision in Orem, Utah County, Utah (the "**Property**"), as

more particularly described in that certain *Purchase and Sale Agreement* dated January

25, 2011 (including Addendum thereto) (the "**Agreement**") between the Debtor as seller and Richmond American Homes of Utah, Inc. ("**Richmond**") as purchaser. A copy of the Agreement is attached hereto as <u>Exhibit 2</u>.

The Debtor proposes to sell the Property to Richmond for a gross purchase price of $1,540,000 (the "**Purchase Price**") ($70,000 per lot) upon the terms and conditions set forth in the Agreement.

The Debtor also requests authority to pay at closing the closing costs, accrued real property taxes, and prorations for which Debtor is responsible under the Agreement. Further, to the extent that liens do or will exist against the Property or the cash proceeds from the sale of the Property, the Debtor further moves the Court, pursuant to 11 U.S.C. § 506(c), to permit the Debtor to recover from the proceeds of the sale an amount sufficient to pay at closing all closing costs, property taxes, and prorations as specified in the Agreement.

In support of the foregoing motion (the "**Motion**"), the Debtor respectfully states as follows.

## MEMORANDUM OF LAW

### I.    JURISDICTION AND VENUE

1.    The Court has jurisdiction respecting the Motion pursuant to 28 U.S.C. §§ 1334 and 157.

2.    The Motion presents a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N) and (O).

3.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.    The legal predicates for the relief sought in the Motion are 11 U.S.C. §§ 330, 363(b), 363(f) and 506(c), and Rules 2016, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure.

## II.   BACKGROUND

5.      The Debtor commenced this bankruptcy case on September 9, 2010 (the "**Petition Date**") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

6.      Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor is operating its business and managing its property as a debtor in possession.

7.      No examiner or trustee has been appointed in the bankruptcy case.

8.      As reflected on Schedule A of the Debtor's schedules of assets and liabilities, on file and of record in this case, the Debtor owns many parcels of real property (collectively, the "**Estate's Properties**").

9.      The Debtor is informed and believes that there is substantial equity in the Estate's Properties that can be realized to provide payment to its creditors and, after payment in full to Bank of America, N.A. (the "**Bank**"),[1] to creditors in the chapter 11 bankruptcy case of the Debtor's parent, Harbor Real Asset Fund, LP ("**Harbor**").  The Debtor intends to sell and/or lease some or all of the Estate's Properties as part of its reorganization efforts.

## III.   FACTS RELEVANT TO THE MOTION

10.     The Property consists of twenty-two (22) single-family residential lots located in Phase 1 of the Sleepy Rider Subdivision, in Orem City, Utah County, Utah.

11.     The Debtor obtained title to the Property through foreclosure, in connection with the Debtor's efforts to collect upon a loan for which the Property was pledged as collateral.

---

[1]      The Bank has asserted or may assert an "interest" in the Property and the other Estate's Properties pursuant to recorded negative pledge agreements.  The bank, however, does not hold a security interest or lien interest in the Property or the other Estate's Properties.  Nevertheless, the Bank is a general unsecured creditor of the Debtor.  As such, the Bank holds a right to payment that is senior in priority to the right of Harbor, the Debtor's sole member, to receive cash distributions from the Debtor.

12.     To the best of the Debtor's information and belief, the following liens exist against the Property, in the following order of priority:

a.     secured claims in amounts aggregating approximately $106,300 (an average of approximately $4,830 per lot) in favor of Utah County, for ad valorem property taxes for tax years 2007, 2008, 2009 and 2010 (as indicated on the preliminary title report, a copy of which is attached hereto as Exhibit 3); and

b.     pro-rated ad valorem property taxes not yet due for tax year 2011 in an amount to be determined.

13.     Prior to the Petition Date: (a) the Property was listed for sale at a listing price of $60,000 per lot; (b) the Debtor sold two similar lots in the subdivision at a sale price of $67,000 each; and (c) the Debtor received an offer from Ivory Homes to purchase the Property at a price of approximately $43,600 per lot.  A contract providing for the sale of the Property to Ivory Homes for $960,000 (approximately $43,000 per lot) expired prior to the Petition Date, and the Debtor thus had no obligation to sell the Property to Ivory Homes at that price or any other price.  Nevertheless, Ivory Homes caused a Notice of Interest to be recorded against the Property in May 2010.  The Debtor's position is that Ivory Homes' Notice of Interest is invalid and improper and that Ivory Homes has no interest in or lien on the Property.  If the Court approves the Agreement and grants the Motion, the Property will be sold to Richmond free and clear of the Notice of Interest filed by Ivory Homes.

14.     The listing agreement mentioned above for the sale of the Property expired prior to the Petition Date, and since the Petition Date the Property has not been and is not currently listed for sale with a broker.  In January 2011, the Debtor received expressions of interest in the Property from D.R. Horton, a large national homebuilder ("Horton"), and from Richmond, another large national homebuilder.  The Debtor requested that Horton and Richmond provide to the Debtor in writing their highest and

best offers for purchase of the Property, and the written offer received from Richmond was higher and better than the written offer from Horton.  Accordingly, the Debtor executed the Agreement with Richmond as of January 25, 2011 (subject to Court approval, which the present Motion seeks).

15.     As of January 25, 2011, the proposed sales price of $70,000 per lot under the terms of the Agreement was higher and better than any other offer the Debtor had received prior to or after the Petition Date, and in the Debtor's business judgment that price, on the terms and conditions specified in the Agreement, is fair and reasonable and represents the fair market value of the Property.

16.     The Agreement provides that "Seller will use its best efforts to obtain Bankruptcy Court approval of the sale" on the terms specified in the Agreement.  See Addendum to Purchase and Sale Agreement (included in Exhibit 2) ¶ 1.

17.     In early February 2011, after the Debtor and Richmond executed the Agreement, the Debtor received another written offer from Horton, this time in the amount of $76,000 per lot, for purchase of the Property.  For various reasons, including that the Debtor is now under contract to sell the Property to Richmond pursuant to the Agreement (subject to Court approval) and that the Horton proposed contract is more complicated than the Agreement and not likely to close as quickly as the sale will close under the Agreement, the Debtor is proceeding to seek approval of the sale to Richmond under the Agreement.

18.     Further, the Debtor has determined that selling the Property on the terms and conditions stated in the Agreement in the best interests of its chapter 11 bankruptcy estate.

## IV.    RELIEF REQUESTED

19.     The Debtor respectfully requests entry of an order, pursuant to 11 U.S.C. §§ 363(b) and (f) and Rules 6004 and 9014 of the Federal Rules of Bankruptcy

Procedure, authorizing Debtor to sell the Property, free and clear of liens, claims and interests, for the Purchase Price and upon the terms and conditions stated in the Agreement.

20.    The Debtor also moves the Court for authority to pay at closing:  (i) all ad valorem property taxes due in connection with the Property as of the time of closing, as reflected in the preliminary title report (Exhibit 3 hereto), including a pro-rated amount of the estimated 2011 property taxes to be reflected as a credit against the Purchase Price; and (ii) closing costs and prorations ordinarily and usually borne by a seller at closing, as more particularly described in the Agreement.  As specified in paragraph 11.10 of the Agreement, there are no brokerage fees to be paid at closing or from the proceeds of the sale.

21.    To the extent the Court determines that liens do or will exist against the Property or the cash proceeds from the sale of the Property, the Debtor further moves the Court, pursuant to 11 U.S.C. § 506(c), to permit the Debtor to recover from the proceeds of the sale an amount sufficient to pay at closing all closing costs, accrued real property taxes, and prorations for which Debtor is responsible under the Agreement.

22.    Finally, the Debtor respectfully requests that, under the circumstances of this case, the Court waive the ten day stay otherwise imposed by Federal Rule Bankruptcy Procedure 6004(h).

## V.    BASIS FOR RELIEF REQUESTED

23.    Pursuant to section 363(b) of the Bankruptcy Code and subject to the requirement of prior notice and a hearing, the Debtor is empowered to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).

24.     The Debtor, in the exercise of its business judgment, has determined that the proposed sale of the Property pursuant to the terms of the Agreement is in the best interests of its chapter 11 bankruptcy estate.  The proceeds of the sale will reduce and/or eliminate the Debtor's obligations to secured creditors (i.e., Utah County), will relieve the Debtor of the burden of further administrative expenses to maintain and sell the Property, and, to the extent excess proceeds result from the sale, will provide funds available for payment of administrative expenses, distribution to unsecured creditors and/or, after payment in full of unsecured creditors of HRAF, distribution to Harbor for payment of its creditors.

25.     Pursuant to section 363(f) of the Bankruptcy Code and subject to the requirement of prior notice and a hearing, the Debtor is empowered to "sell property … free and clear of any interest in such property" if, among other things, "such interest is in bona fide dispute" or if the holder of such an interest "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."  See 11 U.S.C. § 363(f)(4) and (5).

26.     With respect to the Notice of Interest recorded by Ivory Homes, the recording of the Notice of Interest was invalid and improper and Ivory Homes has no valid rights or interests in the Property.  Its only claim to such "interest" is based on a purchase agreement that expired by its own terms prior to the Petition Date.  Thus, there is at least a "bona fide dispute" as to the Notice of Interest recorded by Ivory Homes, and the Property may be sold free of clear of any alleged interest of Ivory Homes pursuant to Section 363(f)(4).

27.     Further, Ivory Homes and the Bank (which may assert that it holds an interest in the Property based on its recorded negative pledge agreements, as discussed above) could be compelled to accept a money satisfaction of their interests, if

any, in the Property.  Thus, the Property may be sold free and clear of their alleged interests pursuant to Section 363(f)(5).

28.     Pursuant to section 506(c) of the Bankruptcy Code, the Debtor "may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of ad valorem property taxes with respect to the property."  11 U.S.C. § 506(c).

29.     At a minimum, the Debtor is entitled to recover from the proceeds of the sale of the Property an amount sufficient to pay closing costs incidental to the sale, including the customary closing costs, accrued real property taxes, and prorations for which Debtor is responsible under the Agreement.

30.     Pursuant to Federal Rule Bankruptcy Procedure 6004(h), an order approving the sale of property of the estate ordinarily is stayed for a period of fourteen days.  Cause exists in the instant Case to order otherwise.

31.     As stated in the 1999 Advisory Committee Note to Rule 6004, the purpose of the stay is "to provide sufficient time for a party to request a stay pending appeal of an order authorizing the use, sale, or lease of property … before the order is implemented."  Accordingly, if no party objects to the Motion, then the stay would serve no purpose because no party would have the right to appeal.

32.     Additionally, a stay of the sale order would negatively impact the Debtor and the estate.  First, the sale is time sensitive.  Second, every day of delay increases the expense and burden of the Property to the estate and results in a decrease in the net proceeds payable to the Debtor.  Among other things, 2011 property taxes are pro-rated.  Additionally, the Debtor is incurring other hard and soft administrative costs associated with the Property.  The sooner the Property can be sold, the sooner these expenses can be cut off.

## VI.   PRAYER FOR RELIEF

ACCORDINGLY, the Debtor respectfully requests that this Court enter an order:

A.      granting the Motion;

B.      pursuant to 11 U.S.C. §§ 363(b) and (f) and Federal Rules of Bankruptcy Procedure 6004 and 9014, authorizing the Debtor to sell the Property free and clear of liens, claims and interests for the Purchase Price and upon such other terms and conditions as provided in the Agreement;

C.      authorizing the Debtor to pay at closing: (i) all ad valorem property taxes due in connection with the Property as of the time of closing, including a pro-rated amount of the estimated 2011 property taxes to be reflected as a credit against the Purchase Price; and (ii) closing costs and prorations ordinarily and usually borne by a seller at closing, as more particularly described in the Agreement;

D.      pursuant to 11 U.S.C. § 506(c), permitting the Debtor to recover from the proceeds of the sale an amount sufficient to pay all property taxes, closing costs and expenses, and prorations for which the Debtor is responsible under the Agreement;

E.      for cause shown, waiving the fourteen day stay otherwise imposed by Federal Rule of Bankruptcy Procedure 6004(h); and

F.      granting such other and further relief as the Court deems just and proper.

Dated:        February 17, 2011

PARSONS KINGHORN HARRIS

/s/ Steven C. Strong
George Hofmann
Steven C. Strong
Attorneys for HRAF Holdings, LLC

# EXHIBIT 1

*Order Prepared and Submitted by:*

George Hofmann (10005)
Matthew M. Boley (8536)
Steven C. Strong (6340)
**Parsons Kinghorn Harris**
A Professional Corporation
111 East Broadway, 11th Floor
Salt Lake City, Utah  84111
Telephone: (801) 363-4300
Facsimile: (801) 363-4378

Attorneys for HRAF Holdings, LLC

---

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re<br><br>HRAF HOLDINGS, LLC, and<br>HARBOR REAL ASSET FUND, LP,<br><br>Debtors. | Bankruptcy No. 10-32433 (RKM)<br>Bankruptcy No. 10-32436  (RKM)<br><br>Jointly Administered under<br>Case No. 10-32433<br><br>Chapter 11<br><br>[Filed Electronically] |

---

### ORDER AUTHORIZING HRAF HOLDINGS TO SELL REAL PROPERTY (22 LOTS IN SLEEPY RIDGE SUBDIVISION) FREE AND CLEAR OF LIENS AND INTERESTS

---

The matter before the Court is the *Motion For Order Authorizing HRAF Holdings to Sell Real Property (22 Lots in Sleepy Ridge Subdivision) Free and Clear of Liens and Interests* (the "Sale Motion") filed by HRAF Holdings, LLC (the "Debtor").  After

reviewing and considering the Sale Motion and such other matters of record as the

Court deemed appropriate, the Court hereby **FINDS AND CONCLUDES** as follows:

     A.      the Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334;

     B.      the Sale Motion presents a core proceeding pursuant to 28 U.S.C. § 157;

     C.      notice of the Sale Motion, and of the hearing thereon, was sent to parties

in interest in accordance with Federal Rule of Bankruptcy Procedure 2002(a)(2) and

other applicable requirements, and such notice was adequate and proper within the

meaning of 11 U.S.C. § 102(1);

     D.      objections to the Sale Motion, if any, have been withdrawn or were

overruled at the hearing on the Sale Motion;

     E.      the proposed sale of real property consisting of 22 single-family residential

lots located in Phase I of the Sleepy Ridge Subdivision in Orem, Utah County, Utah (the

"**Property**"), as more particularly described in the *Purchase and Sale Agreement* dated

January 25, 2011 (including Addendum thereto) (the "**Agreement**") between Debtor and

Richmond American Homes of Utah, Inc. ("**Buyer**") for a gross purchase price of

$1,540,000 (the "**Purchase Price**") and on the terms and conditions more particularly

described in the Agreement, is in the best interests of the Debtor's chapter 11

bankruptcy estate;

     F.      the Purchase Price is a fair and reasonable price for the Property;

     G.      the holders of any interests in the Property, including the holders of any

secured claims, either consent to the sale, have interests that are in bona fide dispute,

or could be compelled, in a legal or equitable proceeding, to accept a money

satisfaction of such interest;

     H.      the Debtor has incurred or will incur costs of sale, property taxes, and

customary prorations in connection with the proposed sale of the Property, as more

particularly described in the Sale Motion;

I.      under the circumstances, the Debtor is entitled to recover from the proceeds of the sale of the Property an amount sufficient to pay (i) reasonable and customary closing costs and prorations incidental to the sale of the Property for which it is responsible under the Agreement, subject to review by the Bank of America, N.A. (the "Bank") of a closing settlement statement, and (ii) all ad valorem property taxes due in connection with the Property, including pro-rated 2011 property taxes estimated at closing;

J.      cause exists to order that the fourteen day stay otherwise applicable under Federal Rule of Bankruptcy Procedure 6004(h) should be waived in that, among other things, (i) no party in interest has objected to the Sale Motion and, therefore, no party-in-interest has a right to appeal, (ii) the proposed sale is time sensitive, and (iii) a stay of the sale order would negatively impact the Debtor and the estate by increasing the expense and burden of the Property to the estate and causing a decrease in the net proceeds payable to the Debtor;

K.      the legal and factual bases set forth in the Sale Motion establish good cause for the relief granted herein; and

L.      the Sale Motion is well taken, and should be granted.

WHEREFORE, based upon the Sale Motion, the arguments and evidence received at the hearing on the Sale Motion, and the foregoing findings and conclusions, the Court hereby **ORDERS** that:

1.      the Sale Motion shall be, and hereby is, GRANTED;

2.      pursuant to 11 U.S.C. §§ 363(b) and (f) and Federal Rules of Bankruptcy Procedure 6004 and 9014, the Debtor shall be, and hereby is, authorized and empowered to sell the Property to Buyer free and clear of liens and interests, for the Purchase Price and upon such other terms and conditions as more particularly stated in the Agreement;

3.      pursuant to 11 U.S.C. § 506(c) the Debtor shall be, and hereby is, authorized and empowered to pay at closing: (a) all ad valorem property taxes due in connection with the Property as of the time of closing, including a pro-rated amount of the estimated 2011 property taxes to be reflected as a credit against the Purchase Price; and (b) closing costs and prorations ordinarily and usually borne by a seller at closing, as more particularly described in the Agreement, but subject to review by the Bank of the closing settlement statement;

4.      the sale of the Property shall be free and clear of any and all liens, encumbrances and other interests;

5.      effective as of closing, liens and interests in the Property not paid at closing (if any) shall be, by this Order and judicial declaration, deemed released and cleared from the Property and shall attach, instead, to the net proceeds of the sale to the same extent, and with the same priority (if any), as such liens attached to the Property prior to the sale ;

6.      any proceeds of the sale not disbursed at closing shall be held by the Debtor at a third-party financial institution that qualifies as a depository institution under Bankruptcy Code § 345, and will not be disbursed by the Debtor to any party in interest absent a further Court order after notice and a hearing, pending a further determination of the priority and amounts of any liens on or interests in the Property which, by this order, have attached to said proceeds;

7.      for cause shown, the fourteen day stay otherwise imposed by Federal Rule Bankruptcy Procedure 6004(h) shall be and hereby is waived and declared inapplicable.

-------------------------------------------- END OF ORDER --------------------------------------------

# EXHIBIT 2

<u>PURCHASE AND SALE AGREEMENT</u>

(Sleepy Ridge Phase 1)

THIS PURCHASE AND SALE AGREEMENT (this "<u>Agreement</u>") is executed as of January 25, 2011 (the "<u>Effective Date</u>"), by HRAF HOLDINGS, LLC ("<u>Seller</u>") and RICHMOND AMERICAN HOMES OF UTAH, INC., a Colorado corporation ("<u>Purchaser</u>").

1.      <u>PROPERTY</u>.  For the consideration and upon the terms and conditions contained in this Agreement, Seller agrees to sell and Purchaser agrees to purchase twenty-two (22) single-family residential lots located in Phase 1 of Sleepy Ridge Subdivision (the "<u>Subdivision</u>"), in Orem City (the "City"), Utah County (the "<u>County</u>"), Utah, together with all attached improvements and, to the extent in lawful existence, all associated rights and appurtenances and all right, title and interest of Seller in and to adjacent streets, alleys or rights of way (collectively, the "<u>Lots</u>").  The legal description of the Lots is attached hereto as <u>Exhibit "A"</u> and is incorporated in this Agreement by this reference.

2.      <u>PURCHASE PRICE</u>.  The purchase price (the "<u>Purchase Price</u>") to be paid by Purchaser to Seller for the Lots shall be $1,540,000.00 based on twenty-two (22) Lots at $70,000 per Lot.

2.1     Purchaser shall, upon not more than five (5) business days following the mutual execution hereof, deposit with the Escrow Agent the sum of $65,000.00 (the "Earnest Money").  The Earnest Money shall apply against the Purchase Price of the Lots acquired at Closing hereunder.  Escrow Agent shall provide notice to Seller within one (1) business day of receipt of the Earnest Money.

2.2     Upon the expiration of the Inspection Period, provided that Purchaser has delivered its Continuation Notice (as defined below), the Earnest Money shall be nonrefundable to Purchaser (except as otherwise expressly set forth in this Agreement) unless the transaction contemplated by this Agreement shall fail to proceed to Closing as the result of the uncured default of Seller or the failure of a condition precedent to Purchaser's obligations under this Agreement.

2.3     The Purchase Price shall be payable in cash or in immediately available funds at the time of the Closing (as defined in Section 9.1 below), subject to the adjustments and prorations set forth in Section 9.4 below.

3.      <u>INSPECTION PERIOD; SUBMISSION ITEMS</u>.

3.1     <u>Inspection Period</u>.  Purchaser shall have a period commencing on the Effective Date and expiring at 12:00 midnight local Utah time on the date that is twenty five (25) days following the mutual execution hereof (the "<u>Inspection Period</u>") to inspect the Lots and to review such other matters as Purchaser deems necessary to determine the suitability of the Lots for Purchaser's needs.  Such investigation may include, without limitation, a physical inspection, an appraisal, an environmental assessment, soils testing, and an engineering inspection of the Subdivision.  If Purchaser, in its sole and arbitrary discretion, determines that the Lots are not suitable for its purposes, then Purchaser may terminate this Agreement on or prior to the expiration of the Inspection Period.  If Purchaser fails to give written notice that the Lots are suitable for its needs and that it

PSA.v1

intends to continue this Agreement (the "Continuation Notice") prior to the expiration of the Inspection Period or if no notice is given, then it shall be deemed conclusively that the Lots are not suitable for its needs and Purchaser elected to terminate this Agreement and the Earnest Money shall be returned to Purchaser. Upon the termination of this Agreement pursuant to this Section 3.1, the Earnest Money and all interest thereon shall be refunded to Purchaser and neither Seller nor Purchaser shall have any further right or obligation hereunder, except to the extent expressly stated to survive termination. This right of termination is exercisable by Purchaser in its sole discretion for any reason whatsoever. Seller acknowledges that it has been advised of the corporate policy of Purchaser that the individual executing this Agreement on behalf of Purchaser is not authorized to bind Purchaser beyond the Inspection Period except for matters of Purchaser indemnification as expressly provided by this Agreement, and accordingly this Agreement is not to be the binding obligation of Purchaser beyond the Inspection Period unless the parent company approval required by Purchaser's governing documents and policies (the "Corporate Approval") has been obtained. If Purchaser provides the Continuation Notice in a timely manner as provided in this Section 3.1, Purchaser will be conclusively deemed to have obtained the Corporate Approval.

3.2     License to Enter.   Seller hereby grants to Purchaser, from and after the Effective Date until the earlier of the expiration or termination of this Agreement, the right, license, permission and consent for Purchaser and Purchaser's agents, representatives, employees and independent contractors to enter upon the Lots for the purposes of performing tests, studies, investigations and analyses relating to Purchaser's feasibility analysis. Any entry and testing that would materially disturb soils upon one or more of the Lots or potentially constitute a nuisance shall be upon advance written notice to the Seller. Purchaser shall fully repair all disturbance caused by entry and testing. Purchaser shall defend, indemnify and hold Seller harmless against any claims, costs, damages, or liability (including, without limitation, reasonable attorney's fees and costs at both trial and appellate level) incurred as a result of the actions by Purchaser, its agents, representatives, employees and independent contractors, in conducting Purchaser's inspection, except for (a) any loss, liability, cost or expense arising from or relating to the wrongful, intentional or negligent acts or omissions of Seller, its agents, representatives, employees or independent contractors, (b) any latent defects in the Lots, or (c) the existence of hazardous materials on the Lots not introduced by, through or under Purchaser. Purchaser shall conduct its investigations at its sole cost and expense, and shall not allow any liens to be placed of record on the Lots. Purchaser's covenants pursuant to this Section 3.2 shall survive expiration or termination of this Agreement.

3.3     Items to be Delivered by Seller.   Within three (3) business days after the Effective Date, Seller shall deliver to Purchaser, at Seller's expense, if any exist and are in the current possession or control of Seller, copies of surveys, preliminary or final plats, plans and specifications for the development of the Lots; engineered drawings; geotechnical reports, environmental assessments; zoning conditions, site plans and general development plans for the Subdivision, together with any executed utility agreements, including, without limitation, electrical, natural gas (if any), water, sewer, telephone and cable television services as may be in Seller's possession (collectively, the "Submission Items. All such materials are provided solely for background information, without any warranty of accuracy, completeness or otherwise, and are not intended to be relied upon by the Purchaser without independent confirmation, investigation and independent

arrangements with the providers of such materials to the Seller. Notwithstanding the foregoing, Seller hereby agrees to inform Purchaser of any known inaccuracies in the Submission Items. If this transaction does not close for any reason, Purchaser shall return to Seller all agreements, documents, studies, reports and other materials pertaining to the Property delivered by Seller to Purchaser pursuant hereto. Seller's only obligation hereunder is to deliver items in Seller's or its agent's control. Purchaser shall have the right, at Purchaser's sole cost and expense, to obtain any additional studies, reports or surveys it determines necessary in order to evaluate the Property.

4.    TITLE REVIEW.

4.1    Initial Review. Promptly upon mutual execution of this Agreement by Purchaser and Seller, Purchaser shall request that First American Title Insurance Agency (the "Escrow Agent") issue to Purchaser a commitment for title insurance covering the Lots, together with legible copies of all title exceptions referred to therein (collectively, the "Title Commitment"). Purchaser shall have until the expiration of the Inspection Period to examine the Title Commitment and to approve or disapprove the state of title to the Lots. If Purchaser delivers the Continuation Notice to Seller, Purchaser will be deemed to have approved the status of title to the Lots as disclosed by the Title Commitment. For purposes of this Agreement, any title matters disclosed in the Title Commitment and approved or deemed approved by Purchaser shall be deemed to be "Permitted Exceptions." Notwithstanding any contrary provisions set forth in this Section, Seller shall be required to obtain the deletion of the standard pre-printed exceptions set forth on Schedule B-2 of the Title Commitment, to the extent they can be deleted without the preparation of a survey and further provided that Seller's obligation shall not extend beyond execution of the Escrow Agent's form Owner's Affidavit, and to obtain the release of all liens of an ascertainable amount, other than the liens securing ad valorem taxes not yet due and payable, regardless of whether Purchaser objects to such items in its Title Objections, and such items shall not be Permitted Exceptions for purposes of this Agreement.

4.2    Title Policy. At Closing, Escrow Agent shall mark up the Title Commitment and promptly thereafter shall be unconditionally committed to issue a standard Owner's ALTA Form B 1970 Policy (the "Title Policy") pursuant to the Title Commitment in the amount of the Purchase Price for the Lots acquired at said Closing, subject only to the Permitted Exceptions. Seller and Purchaser agree to reasonably cooperate with Escrow Agent and each other in the provision and execution of any customary and reasonable documents that Escrow Agent may require in connection with issuance of the Title Policy.

5.    REPRESENTATIONS AND WARRANTIES OF SELLER. To induce Purchaser to enter into this Agreement, Seller makes the warranties and representations below, each of which shall be true and correct as of the Effective Date and as of the Closing Date and shall specifically survive the Closing:

5.1.    Seller will convey to Purchaser fee simple title to the Lots free and clear of all liens, defects, encumbrances, conditions, exceptions, restrictions and other matters of title created by, through or under Seller, subject to the Permitted Exceptions.

5.2     To Seller's actual knowledge, there is no litigation or proceeding pending or threatened against or relating to any of the Lots, and Seller has received no written notice of any such litigation or proceeding.

5.3     Seller is duly organized, existing and in good standing the state of its formation and is qualified to transact business in the State of Utah.  Seller has the right, power and authority to enter into and to perform all of the covenants to be performed by Seller in accordance with this Agreement, and Seller's right to execute this Agreement is not limited. The individual executing this Agreement on behalf of Seller has all necessary power and authority to execute this Agreement and to bind Seller to the terms hereof.

5.4     Seller has not applied for or other otherwise caused any change in any zoning or other governmental requirement applicable to the Lots.

5.5     There are no attachments, executions, assignments for the benefit of creditors, or voluntary or involuntary proceedings under the Bankruptcy Code, 11 U.S.C. §101, et seq., or under any other debtor relief laws contemplated by or pending or, to the best of Seller's knowledge, threatened against Seller that would materially and adversely affect title to the Lots.

5.6     To Seller's actual knowledge:  (a) there are no parties other than Seller in possession of any portion of the Lots, and (b) except as provided in this Agreement or under a "backup" contract for purchase, no person or entity has any legal right or option to acquire all or any portion of the Lots.

5.7     Execution and delivery of this Agreement and consummation of the transaction described herein will not conflict with, or constitute a default under, any agreement to which Seller is a party or by which Seller is bound, or violate any regulation, law, court order, judgment, or decree applicable to Seller.

5.8     Purchaser acknowledges that the Seller is not the developer of the Property and that the Property is being sold to the Purchaser in its "as-is" condition with no warranties of condition of any kind including but not limited to warranties of fitness for any particular purpose, except as set forth herein, in the conveyance deed or other documents delivered at Closing.

6.     COVENANT REGARDING NOTICES.  Seller shall promptly advise Purchaser of any notices received by Seller from governing authorities having jurisdiction over the Lots (the "Authorities") concerning the Lots, and of any litigation, arbitration, or administrative hearing concerning the Lots.

7.     REPRESENTATIONS AND WARRANTIES OF PURCHASER.  To induce Seller to enter into this Agreement, Purchaser makes the following representations and warranties to Seller, each of which shall be true and correct as of the Effective Date and as of the Closing Date and shall specifically survive the Closing:

7.1     Purchaser is duly organized, existing and in good standing under the laws of the State of Colorado, and are duly qualified to transact business in the State of Utah.

PSA.v1                                                            4

Purchaser, subject to obtaining the Corporate Approval, has the requisite power and authority to enter into this Agreement and perform the obligations hereunder, and Purchaser's rights to execute this Agreement are not limited. The individual executing this Agreement on behalf of Purchaser has all necessary power and authority to execute this Agreement and to bind Purchaser to the terms hereof.

7.2     There are no attachments, executions, assignments for the benefit of creditors, or voluntary or involuntary proceedings under the Bankruptcy Code, 11 U.S.C. §101, et seq., or under any other debtor relief laws contemplated by or pending or threatened against Purchaser.

7.3     The execution, delivery and performance of this Agreement will not result in a breach of, or conflict with, the terms of any agreement to which Purchaser is a party, or of any judgment, decree, order or award of any court, governmental body or arbitrator, or of any law, rule or regulation applicable to Purchaser.

8.     CONDITIONS PRECEDENT TO CLOSING. The obligation of Purchaser to close the transaction described in this Agreement shall be subject to the following conditions precedent (the "Conditions"):

8.1     All the representations and warranties of Seller set forth in this Agreement shall be true and correct as of the Effective Date and as of the Closing Date, and Seller shall have complied with all covenants and agreements of Seller set forth herein;

8.2     Seller shall have tendered performance of all of its obligations and covenants under this Agreement;

8.3     Escrow Agent shall be prepared to issue the Title Commitment, marked-up at the time of the Closing, in form and content as required by Section 4.2 of this Agreement, and shall be unconditionally committed to issue the Title Policy promptly after the Closing;

8.4     The environmental condition and physical condition of the Lots at the time of Closing shall not be materially and adversely different from the environmental condition existing as of the expiration of the Inspection Period (unless, and only to the extent, such change in condition arises by, through or under the Purchaser);

8.5     There shall be no litigation or proceeding pending or threatened against Seller or the Lots which would affect:  (a) title to the Lots; (b) Seller's ability to transfer the Lots to Purchaser in accordance with the terms of this Agreement; or (c) Purchaser's construction and sale of homes on the Lots;

8.6     There shall be no threatened or pending condemnation proceeding with respect to the Lots.  If at any time prior to the earlier of termination or expiration of this Agreement Seller shall receive notice of the commencement or threatened commencement of eminent domain, condemnation or other like proceedings against any of the Lots, Seller shall notify Purchaser, in writing, of any such proceedings. Purchaser shall elect within ten (10) days of receipt of such notice, by delivery of written notice to Seller, either (a) to

terminate this Agreement with respect to the affected Lots, or (b) to close the transaction contemplated hereby in accordance with its terms, but subject to such proceedings, in which event the Purchase Price shall remain the same, and Seller shall transfer and assign to Purchaser, at the Closing, all condemnation proceeds and rights to additional condemnation proceeds, if any, applicable to such affected Lots. If Purchaser does not timely notify Seller of Purchaser's election to terminate in accordance with the foregoing, Purchaser shall be deemed to have elected to terminate this transaction with respect to the affected Lots in accordance with clause (a) of this Section 8.7; and

8.7    No moratorium, delay, hindrance, deferment or other measure (collectively, a "Moratorium") shall have been imposed subsequent to the expiration of the Inspection Period which would impair Purchaser's ability to timely obtain the issuance of building permits or certificates of occupancy. If a Moratorium is imposed subsequent to the expiration of the Inspection Period, Purchaser shall have the right, but not the obligation, to terminate this Agreement.

If any of the Conditions is not satisfied or waived in writing by Purchaser prior to the Closing, Purchaser may elect either to: (a) terminate this Agreement, in which event the Earnest Money and all interest accrued thereon shall be refunded to Purchaser and thereafter this Agreement shall terminate; (b) waive such Condition and proceed with the Closing. If Purchaser fails to provide written notice of its election to Seller prior to the Closing Date, Purchaser shall be deemed to have elected to terminate this Agreement in accordance with the preceding clause (a). Seller agrees to use commercially reasonable efforts to fulfill the Conditions that are within its control in a timely manner.

9.    CLOSING PROCEDURES.

9.1    Closing Dates. The sale and purchase of the Lots shall be consummated at a closing (the "Closing") to be held on the date that is five (5) days following expiration of the Inspection Period.

9.2    Items to be Delivered by Seller at Closing. No later than one business day prior to the Closing Date, Seller shall deliver or cause to be delivered to Escrow Agent, at Seller's expense, each of the following items:

9.2.1    A special warranty deed (the "Deed") duly executed and acknowledged by Seller in the form attached hereto as Exhibit "B", subject to the Permitted Exceptions;

9.2.2    A resolution of other document evidencing Seller's authority to consummate this transaction and the signatory executing the conveyance documents is so authorized;

9.2.3    Seller's FIRPTA affidavit, which shall include Seller's U.S. Taxpayer Identification Number, the business address of Seller; and certification that Seller is not a non-resident alien, foreign corporation, foreign partnership, foreign trust, foreign estate or other foreign person within the meaning of Sections 1445 and 7701 of the Internal Revenue Code and the related Treasury Regulations



(collectively, the "IRC"). Escrow Agent is authorized to submit any certification delivered by Seller pursuant to this paragraph to the Internal Revenue Service (the "IRS") and to disclose the details of this transaction, but only in the event such disclosure is required by the IRS.

9.2.4   An owner's affidavit in favor of Purchaser and the Escrow Agent in a form sufficient to enable the Escrow Agent to issue the Title Policy.

9.2.5   A certificate confirming the truth and accuracy of Seller's representations and warranties contained herein in the form attached hereto as Exhibit "C";

9.2.6   A closing statement, in form and content mutually acceptable to Purchase and Seller, executed by Seller and showing the amount of the Purchase Price, fees, title insurance charges, prorations for homeowners' association dues, fees, taxes, assessments, recording costs, and other amounts provided for in this Agreement (the "Closing Statement");

9.2.8   Any other documents required by this Agreement or reasonably necessary in order to close this transaction.

9.3   Items to be Delivered by Purchaser at Closing. At Closing, Purchaser shall deliver or cause to be delivered to Escrow Agent, at Purchaser's expense, each of the following items:

9.3.1   The balance of the Purchase Price, subject to the adjustments and prorations to be made in accordance with Section 9.4 below;

9.3.2   The Closing Statement executed by Purchaser.

9.3.3   A certificate confirming the truth and accuracy of Purchaser's representations and warranties contained herein;

9.3.5   Any other documents required by this Agreement or reasonably necessary in order to close this transaction as to the Lots.

9.4   Adjustments and Prorations. At Closing, the following items set forth shall be adjusted, prorated and allocated between Seller and Purchaser, and all such adjustments, prorations and alterations shall be reflected on the Closing Statement, which Escrow Agent shall provide to Seller and Purchaser for review no later than two (2) business days prior to the Closing Date. Seller and Purchaser shall agree upon the final Closing Statement no later than the close of business on the business day prior to the Closing Date. If any proration is based upon an estimate rather than an actual billed amount, the parties shall cause such proration to be readjusted and an appropriate adjustment paid based on the amount of the actual billing within 30 days after written notice from one party to the other after the actual bill has been received.

9.4.1   Ad valorem property taxes and assessments and homeowners' association assessments for the current year shall be prorated as of the Closing Date.

PSA.v1                                          7

9.4.2   Seller shall pay the premium for a standard Title Policy and Purchaser shall pay for any charge for extended coverage and for any endorsements requested by Purchaser unless Seller has agreed to pay for the same to cure a Title Objection. Seller shall pay for recording costs of the deed and documentary transfer taxes on the Deed and any transfer fees or charge or fee required to obtain a reliance letter or other confirmation from the homeowners' association with jurisdiction over the Lots as to the amount and status of the payment of any assessments, capital contributions and other amounts payable to the homeowners' association on or prior to the Closing Date and such other matters relating to the homeowners' association as Escrow Agent may require to close this transaction and to issue the Title Policy.

9.4.3   Each party shall pay its own attorneys' fees and expenses and one-half of the closing fee of the Escrow Agent (provided that Seller's obligation for fees to the Escrow Agent shall not exceed a maximum of $500.00).

9.4.4   The agreements as to prorations and adjustments in this Section 9.4 shall survive Closing.

9.5   <u>Right to Possession</u>.  Purchaser shall be given full and unrestricted right to possession of the Lots conveyed at the Closing.

9.6   <u>Tax Protests</u>.  At Closing, Seller shall be deemed to have assigned to Purchaser all of Seller's right, title and interest in and to all tax and assessment protest actions and claims, if any, to seek reductions for property tax purposes in the valuation of the Lots, and the right to prosecute same, for any period prior to or after the Closing Date, including without limitation all of Seller's right, title and interest in and to all tax and assessment refunds or rebates, if any, now or hereafter payable for any period prior to or after the Closing Date. Seller shall not be responsible for or entitled to any refunds resulting from any such protests or claims. Seller agrees to execute any assignment of its rights relating to tax and assessment refunds as may be reasonably requested by Purchaser or the appropriate governing body or agency so as to facilitate Purchaser's prosecution of tax and assessment protest actions and claims, provided Seller shall incur no risk, liability, cost or expense in connection with the same.

10.   <u>REMEDIES UPON DEFAULT.</u>

10.1   <u>Default by Seller</u>.  If Seller fails to timely comply with any condition, covenant, or obligation of Seller hereunder, and if such failure is not cured within ten (10) days after written notice from Purchaser, such failure shall be a default, and Purchaser shall have the right to: (a) terminate this Agreement by giving written notice of such election to Seller, in which event the Earnest Money shall be refunded to Purchaser and thereafter this Agreement shall be of no further force or effect except as otherwise expressly provided by the terms of this Agreement; or (b) enforce specific performance of Seller's obligations under this Agreement. Purchaser shall have no right to damages (including without limitation, actual, consequential, punitive, incidental, or exemplary) arising from Seller's default under this Agreement, other than for a breach of any indemnification obligation of Seller hereunder or of a representation and warranty. Notwithstanding the foregoing to the

contrary, if Seller fails to satisfy its obligation to release all monetary liens and encumbrances that it is obligated by the terms of this Agreement to release at or prior to the Closing, Purchaser may elect to satisfy such obligations, and in such event Purchaser will receive a credit against the Purchase Price in the amount of the payments required for such purpose.

      10.2   <u>Default by Purchaser</u>.  If all conditions of this Agreement have been satisfied or waived in accordance with the terms of this Agreement and all covenants and obligations to be performed by Seller prior to the Closing Date have been fully performed, and if performance of this Agreement has been fully tendered by Seller and the sale is not consummated on or before the Closing Date as a result of default by Purchaser, then Seller as Seller's sole and exclusive remedy shall be to terminate the Agreement and to retain, as full liquidated damages, the Earnest Money.  It is agreed by the parties that the sum of the Earnest Money is a fair and reasonable measure of the damages to be suffered by Seller in the event of such default and that the exact amount thereof is incapable of ascertainment. Therefore, the payment of liquidated damages as agreed herein represents the reasonable damages of the Seller in the event of a default by the Purchaser and not a penalty.

11.    MISCELLANEOUS.

      11.1<u>Notices</u>.  Any notice, demand, or other communication required to be given in accordance with this Agreement shall be in writing and delivered to the person to whom the notice is directed, either: (a) in person; (b) by United States Mail, as a registered or certified item with postage prepaid and return receipt requested; (c) by a recognized overnight courier service (such as Federal Express or DHL) that provides a delivery receipt; or (d) via facsimile transmission evidenced by electronic confirmation of receipt. Any notice, demand, or other communication shall be deemed to have been given and received when delivered to the address of the party to whom it is addressed as stated below and receipted for by same (or upon the second attempt at delivery if delivery is refused):

      If to Purchaser:

      Richmond American Homes of Utah, Inc.
      849 West LeVoy Drive, Suite 100
      Salt Lake City, Utah 84123
      Attn:  David Vitek
          Phone: 801-743-7445
          Fax: 801-743-7446

      With copy to:

      M.D.C. Holdings, Inc.
      4350 South Monaco St, Suite 500
      Denver, Colorado 80237
      Attn:  Paula Williams
      Telephone: (720) 977-3210
      Facsimile: (720) 977-4743

      If to Seller:

PSA.v1

9

HRAF HOLDINGS, LLC
7659 South Main Street
Midvale, UT 84047
Attn:   Ryan Relyea
Phone: 801-208-3701
Fax: 801-208-3705

If to Escrow Agent:

First American Title Insurance Agency
7730 South Union Park Avenue, Suite 110
Midvale, Utah 84047
Attn: Dorothy Merrill
Telephone: (801) 569-3369
Facsimile: (866) 677-5598

Either party may change its address for notice by giving the other party three (3) days' advance written notice of such change of address.  Any notice delivered by a party's attorney on behalf of such party shall be effective for such purpose under this Agreement.

In the event Seller believes that it has not timely received the Continuation Notice or any other applicable notice by which the Purchaser may elect a course of action alternative to termination of this Agreement, Purchaser shall be conclusively deemed to have terminated this Agreement if Purchaser does not provide evidence of timely delivery of such notice within two business days after Purchaser's receipt of Seller's written demand for evidence delivery.

11.2 Agreement to Survive.  Unless otherwise provided herein, all representations, warranties, covenants, and agreements contained herein, whether to be performed before or after the Closing Date, shall not be deemed to be merged into or waived by the instruments of Closing but shall survive the Closing.

11.3 Assignment.  This Agreement shall be binding upon and shall inure to the benefit of Seller and Purchaser and their respective successors and permitted assigns. Purchaser shall have the right to assign this Agreement without the prior consent of Seller, provided Purchaser shall not be released of its obligations in accordance with this Agreement as a result of any such assignment.  Seller shall not have the right to assign any or all of its rights or interest herein without Purchaser's prior consent, which may be withheld in Purchaser's reasonable discretion.

11.4 Applicable Law.   This Agreement shall be construed and interpreted in accordance with the laws of the State of Utah.

11.5 Interpretation.  Where required for proper interpretation, words in the singular shall include the plural; and words of any gender shall include all genders. The descriptive headings of the paragraphs in this Agreement are for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

PSA.v1                                    10

11.6 Amendment.   This Agreement may not be amended and no condition, covenant, or obligation may be waived, except by an agreement in writing signed by Seller and Purchaser.

11.7 Jury Trial Waiver.   PURCHASER AND SELLER EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE A TRIAL BY JURY FOR ANY CLAIM OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN), OR ACTION OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS AGREEMENT.

11.8 Entire Agreement; Exhibits.   This Agreement including the exhibits attached hereto constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, oral or written, of the parties in connection therewith.   All Exhibits attached hereto are true and correct and are hereby incorporated into this Agreement by this reference.

11.9 Multiple Counterparts.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one original instrument.

11.10   Brokers.   Seller and Purchaser each represents and warrants to the other that other than Dustin Holt with Salt Lake Realty to whom Purchaser shall pay a fee pursuant to a separate agreement, no broker or finder has been engaged by it in connection with this transaction.   If any claim is brought for a broker's or finder's fee or commission in connection with the negotiation, execution, or consummation of this Agreement other than specified above, then each party, shall indemnify, hold harmless, and defend the other party from and against any such claim arising as a result of any statement, representation or agreement made by or allegedly made by the indemnifying party.  This indemnity shall survive Closing as well as the expiration or termination of this Agreement.

11.11   Construction.   The parties acknowledge that they have had the opportunity to be represented by counsel in connection with the transactions contemplated herein and that this Agreement shall be interpreted according to its fair construction and shall not be construed more strictly against the drafting party.

11.12   Invalidity.   If any provision in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

11.13   Further Assurances.   In addition to the acts required to be performed by Seller in accordance with the other provisions of this Agreement, Seller will perform at or after Closing all further acts that Purchaser or Escrow Agent may reasonably request,



provided they may be performed at no additional cost, expense or liability to Seller, in order to: (a) evidence and vest in Purchaser fee simple ownership of and good and marketable title to all of the Lots; and (b) consummate the transactions contemplated by this Agreement.

11.14 <u>Time is of the Essence</u>. Time is of the essence with respect to every provision of this Agreement. Any act performable on an official United States holiday, or a Saturday or Sunday shall be performable on the next business day following such date. Unless otherwise expressly stated, all time periods set forth herein shall be calculated in calendar days.

11.15 <u>Waiver</u>. No waiver by either party of any of its rights or remedies hereunder or otherwise shall be considered a waiver of any other subsequent right or remedy. Except as expressly provided herein, no waiver by either party of any of its rights or remedies hereunder or otherwise shall be effective unless such waiver is evidenced in a written instrument executed by the waiving party.

11.16 <u>No Assumption</u>. Purchaser is acquiring only the Lots from Seller and is not the successor of Seller. Purchaser does not assume or agree to pay, or indemnify Seller or any other person or entity against any liability, obligation, or expense of Seller relating to the Lots in any way except, and only to the extent, if any, expressly provided for herein or in the documents executed at Closing.

11.17 <u>Publicity</u>. Neither Seller nor Purchaser shall issue any press release or otherwise publicize in any manner (or permit Broker, if any, to publicize in any manner) the transactions contemplated by this Agreement without the other party's prior written consent, which Purchaser or Seller, as applicable, may withhold before the Closing Date in its sole and absolute discretion.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

SELLER:

HRAF HOLDINGS, LLC

By: _____
Name: _____
Title: _____

PURCHASER:

RICHMOND AMERICAN HOMES OF
UTAH, INC, a Colorado corporation

By: _____
    David Vitek, President



## ESCROW AGENT ACKNOWLEDGMENT

    The undersigned joins in the execution of this Agreement for the purpose of agreeing to act as Escrow Agent in accordance with the applicable terms of this Agreement.

<u>ESCROW AGENT</u>:

FIRST    AMERICAN    TITLE    INSURANCE
AGENCY

By:_____
Name:_____
Title:_____



**Addendum to Purchase and Sale Agreement**

The following terms are hereby incorporated as part of the Purchase and Sale Agreement (the "Agreement"), including any addenda to the Agreement, between HRAF Holdings, LLC (the "Seller"), and Richmond American Homes of Utah, Inc. (the "Purchaser"). Capitalized terms used herein and not otherwise defined have the meanings ascribed them in the Agreement. To the extent the following terms modify or conflict with the provisions of the Agreement, these terms shall control. All other terms of the Agreement not modified shall remain the same.

1.     <u>Bankruptcy Court Approval</u>. The parties hereby acknowledge and agree that this Agreement is subject to the approval of the United States Bankruptcy Court for the District of Utah (the "Bankruptcy Court"). In addition, Bank of America, N.A. has filed a negative pledge interest related to the Lots. As a result, the Seller's obligation to deliver free and clear title to the lots is subject to (a) obtaining an order of the Bankruptcy Court to that effect; and (b) to the extent Seller deems necessary, obtaining the consent of Bank of America, N.A. to the sale. The Seller will use its best efforts to obtain Bankruptcy Court approval of the sale and, to the extent the Seller deems necessary, to obtain the consent of Bank of America, N.A., to the sale. In the event the entry into and performance of the Agreement is not approved by the Bankruptcy Court or if the Seller requires the consent of Bank of America, N.A. and is unable to obtain that consent, the Agreement shall be automatically null and void, and the Earnest Money shall be returned to the Purchaser, unless otherwise mutually agreed by the parties.

2.     <u>No Representations or Warranties</u>. Notwithstanding anything in the Agreement to the contrary, the Lots are being sold "As Is" and "Where Is" in all respects; neither the Seller nor any of its agents, attorneys, or representatives has made or makes any warranty or representation whatsoever regarding the Lots, or any other matter in any way related to the Lots, including, but not limited to, title to the Lots, utilities, sewer, road construction, subdivision, zoning, use, value, environmental condition, access, wetlands, water table, water shares or rights, or any other condition of the Lots or any improvement or personal property located thereon. THE PURCHASER REPRESENTS AND WARRANTS THAT IT HAS NOT RELIED ON THE SELLER'S SKILL OR JUDGMENT TO SELECT OR FURNISH ALL OR ANY PORTION OF THE LOTS FOR ANY PARTICULAR PURPOSE AND THE SELLER EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Purchaser is not relying upon, and hereby specifically waives any claim of liability based on any statement, representation, warranty, promise, covenant, or undertaking by the Seller or any other person representing or purporting to represent the Seller in connection with the Lots.

3.     <u>Retention of Jurisdiction</u>. The Bankruptcy Court shall retain exclusive jurisdiction to adjudicate any controversy, dispute or claim arising out of or in connection with the Agreement, or the breach, termination or validity thereof.

4.     <u>Environmental Hazards</u>. Purchaser acknowledges that Lots are a potentially dangerous place. Flammable, noxious, corrosive and pressurized substances may be present. Heavy equipment may be operated, and electrical circuits may be live. Every person enters the Lots as his or her own risk with notice of the condition of the Lots and the activities that will be or have been conducted on the Lots. Purchaser shall so advise its agents and employees. No



person shall have any claim against the Seller, the Seller's bankruptcy estate, or any of their agents, attorneys, or employees, for any injuries sustained or for damages to or loss of property that may occur at the Lots except as may arise from Seller's negligence or willful misconduct. It is Purchaser's sole responsibility to meet all governmental safety and environmental standards in using the Lots. Certain portions of the Lots may contain "hazardous substances," "hazardous wastes," "hazardous materials," or "oil" as those terms are defined under federal, state or local environmental laws and regulations (collectively, "Hazardous Substances"). The Seller has no duty to remove any Hazardous Substances that are contained in or are a part of the Lots, however, if Purchaser discovers any Hazardous Substances prior to Closing, Purchaser shall have the right to terminate this Agreement by written notice to Seller and receive a return of the Earnest Money.

8.    Purchaser's Post-Closing Use of Lots. Purchaser agrees to defend (by counsel reasonably satisfactory to Purchaser) and indemnify the Seller and its agents, attorneys and employees, from and against any claim, demand, cause of action, liability or expense (including reasonable attorneys' fees and costs) asserted against or incurred by the Seller of the Seller's bankruptcy estate in connection with the ownership or operation of the Lots arising after Closing of the Agreement except for anything arising from Seller's negligence or willful misconduct.

9.    Title Insurance. Notwithstanding anything in paragraph 9.4.2 of the Agreement to the contrary, any title policy requested by Purchaser shall be issued at Purchaser's expense, and Seller shall have no obligation to pay for or reimburse Purchaser for this policy.

10.    Bankruptcy Filing. Purchaser acknowledges that Seller filed a voluntary Chapter 11 petition and is acting as a debtor-in-possession. As a result, Purchaser and Seller hereby agree to delete Section 5.5 of the Agreement.

11.    Attorneys' Fees. Purchaser and Seller shall each bear their own attorneys' fees in connection with the negotiation of the Agreement, the Closing, and any breach or alleged breach of the Agreement by any party.

12.    Publicity. Because Seller is required to provide notice of its motion to obtain Bankruptcy Court approval to all parties in interest in its bankruptcy case, and because it is required to file that motion with the Bankruptcy Court, the Purchaser and Seller acknowledge that this Agreement will be publicized to the extent necessary to obtain Bankruptcy Court approval, and the Purchase and Seller hereby agree to delete Section 11.17 of the Agreement.

13.    Survival. Sections 1-13 of this Addendum shall survive the Closing of this Agreement.

14.    Counterparts. This Addendum may be executed in counterparts and counterparts containing the signatures of all parties shall represent one and the same agreement.

DATED this ⟨25⟩ day of January, 2011.



PURCHASER:

_____

Richmond American Homes of Utah, Inc.
By:
Its:

SELLER:

_____

HRAF Holdings, LLC
By: Ryan Rogers
Its: Manager

# EXHIBIT 3

# COMMITMENT FOR TITLE INSURANCE

### ISSUED BY

**First American Title Insurance Company**
**7730 South Union Park Ave, Ste 110, Midvale, UT 84047**
**Phone: (801)569-3369  |  Fax: (801)569-3870**

First American Title Insurance Company
7730 South Union Park Ave, Ste 110
Midvale, UT 84047

February 03, 2011
Order Number:  051-5365579

Attn:  Dorothy Merrill -  Roberta Wilson

Additional copies, if any, have been sent to the following parties:

, Richmond American Homes of Utah, Inc, 849 Levoy Drive, Salt Lake City, UT 84123

***

RE: Richmond American Homes of Utah, Inc.

We agree to issue a policy to you according to the terms of this Commitment.  When we show the policy amount and your name as the proposed insured in Schedule A, this Commitment becomes effective as of the Commitment Date shown in Schedule A.

If the Requirements shown in this Commitment have not been met within six months after the Commitment Date, our obligation under this Commitment will end.  Also, our obligation under this Commitment will end when the Policy is issued and then our obligation to you will be under the Policy.

Our obligation under this commitment is limited by the following:  (1)  The Provisions in Schedule A. (2)  The Requirements in Schedule B-1.  (3)  The Exceptions in Schedule B-2. (4)  The Conditions on the inside cover page.

The Commitment is not valid without SCHEDULE A and Sections 1 and 2 of SCHEDULE B.

Underwritten by:

*First American Title Insurance Company*

BY _____  PRESIDENT

ATTEST _____  SECRETARY

No.  051-5365579

## SCHEDULE A

**ESCROW/CLOSING INQUIRIES** should be directed to your Escrow Officer:  **Dorothy Merrill at (801)569-3369 located at 7730 South Union Park Ave, Ste 110, Midvale, UT 84047.**

Effective Date:  **January 18, 2011** at 7:30 a.m.

1.      Policy or (Policies) to be issued:

      ALTA 2006 Standard Owner's for $1,540,000.00         **PREMIUM**   **$3,804.00**

      Proposed Insured:
      **Richmond American Homes of Utah, Inc.**

      ALTA 2006 Extended Lender's for $0.00         **PREMIUM**   **$TBD**

      Proposed Insured:
      **To Be Determined**

      Endorsements         **PREMIUM**   **$**

2.      The estate or interest in the land described or referred to in this commitment and covered herein is fee simple and title thereto is at the effective date hereof vested in:

        **HRAF Holdings, LLC, a Delaware Limited Liability Company**

3.      The land referred to in this Commitment is located in Utah County, UT and is described as:

      LOTS 115, 116, 118, 119, 121, 122, 123, 125, 126, 127, 128, 129, 130, 133, 134, 135, 139, 143, 146, 147, 150, AND 151, PLAT "B", PHASE 1, THE LAKES AT SLEEPY RIDGE PHASE SUBDIVISION, ACCORDING TO THE OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE UTAH COUNTY RECORDER'S OFFICE.

               Said property is also known by the street address of:
                 1972 West 475 South, Orem, Utah 84057
                 1992 West 475 South, Orem, Utah 84057
                 2012 West 475 South, Orem, Utah 84057
                 451 South 2020 West, Orem, Utah 84057
                 419 South 2020 West, Orem, Utah 84057
                 420 South 2020 West, Orem, Utah 84057
                 440 South 2020 West, Orem, Utah 84057
                 480 South 2020 West, Orem, Utah 84057
                 465 South 2060 West, Orem, Utah 84057
                 453 South 2060 West, Orem, Utah 84057
                 441 South 2060 West, Orem, Utah 84057
                 429 South 2060 West, Orem, Utah 84057
                 417 South 2060 West, Orem, Utah 84057
                 412 South 2060 West, Orem, Utah 84057

No. 051-5365579

436 South 2060 West, Orem, Utah 84057
448 South 2060 West, Orem, Utah 84057
461 South 2100 West, Orem, Utah 84057
464 South 2100 West, Orem, Utah 84057
2115 West 475 South, Orem, Utah 84057
2113 West 475 South, Orem, Utah 84057
2067 West 475 South, Orem, Utah 84057
2011 West 475 South, Orem, Utah 84057,

No. 051-5365579

**SCHEDULE B - Section 1**
**Requirements**

The following are the requirements to be complied with:

(A)    Pay the agreed amounts for interest in the land and/or the mortgage or deed of trust to be insured.

(B)    Pay us the premiums, fees and charges for the policy.  In the event the transaction for which this commitment is furnished cancels, the minimum cancellation fee will be $100.00.

(C)    Provide us with releases, reconveyances or other instruments, acceptable to us, including payment of any amounts due, removing the encumbrances shown in Schedule B-2 that are objectionable to the proposed insured.

(D)    Provide us with copies of appropriate agreements, resolutions, certificates, or other evidence needed to identify the parties authorized to execute the documents creating the interest to be insured.

(E)    After we have received the information requested in these requirements, together with any other information about the transaction, we will have the right to add requirements to this Schedule B-1 or special exceptions to Schedule B-2.

(F)    Provide us with any information regarding personal property taxes which may have been assessed or are due and payable which could become a lien on the real property.

\*\*\*

No.  051-5365579

**SCHEDULE B - Section 2**
**Exceptions**

Any policy we issue will have the following exceptions unless they are taken care of to our satisfaction.

1.    Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.

2.    Any facts, rights, interest or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.

3.    Easements, claims of easements or encumbrances which are not shown by the public records.

4.    Discrepancies, conflicts in boundary lines, shortage in area, encroachments and any other facts which a correct survey would disclose, and which are not shown by public records.

5.    Unpatented mining claims; reservations or exceptions in patents or in Acts authorizing the issuance thereof, water rights, claims or title to water.

6.    Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

7.    Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed insured acquires of record for value the estate or interest or mortgage thereon covered by this commitment.

8.    Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0115

9.    General property taxes for the year(s) 2007 are **delinquent** in the principal amount of $1,332.50, plus interest, penalty and costs.  Tax Parcel No. 45-436-0115

      Subsequent delinquency for the year 2008 in the principal amount of $1,347.91, plus interest, penalty and costs.

      Subsequent delinquency for the year 2009 in the principal amount of $1,085.50, plus interest, penalty and costs.

      Subsequent delinquency for the year 2010 in the principal amount of $866.01, plus interest, penalty and costs.

10.   Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0116

11.   General property taxes for the year(s) 2007 are **delinquent** in the principal amount of $1,362.33, plus interest, penalty and costs.  Tax Parcel No. 45-436-0116

No. 051-5365579

Subsequent delinquency for the year 2008 in the principal amount of $1,378.08, plus interest, penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,101.78, plus interest, penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $903.99, plus interest, penalty and costs.

12.   Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0118

13.   General property taxes for the year(s) 2007 are **delinquent** in the principal amount of $1,402.10, plus interest, penalty and costs.  Tax Parcel No. 45-436-0118

Subsequent delinquency for the year 2008 in the principal amount of $1,418.32, plus interest, penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,123.49, plus interest, penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $950.86, plus interest, penalty and costs.

14.   Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0119

15.   General property taxes for the year(s) 2007 are **delinquent** in the principal amount of $1,392.16, plus interest, penalty and costs.  Tax Parcel No. 45-436-0119

Subsequent delinquency for the year 2008 in the principal amount of $1,408.26, plus interest, penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,118.07, plus interest, penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $939.51, plus interest, penalty and costs.

16.   Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0121

17.   General property taxes for the year(s) 2007 are **delinquent** in the principal amount of $1,372.27, plus interest, penalty and costs.  Tax Parcel No. 45-436-0121

Subsequent delinquency for the year 2008 in the principal amount of $1,388.14, plus interest, penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,107.21, plus interest, penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $916.07, plus interest, penalty and costs.

18.   Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0122

No. 051-5365579

19.  General property taxes for the year(s) 2007 are **delinquent** in the principal amount of $1,421.99, plus interest, penalty and costs.  Tax Parcel No. 45-436-0122

Subsequent delinquency for the year 2008 in the principal amount of $1,438.44, plus interest, penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,134.35, plus interest, penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $972.94, plus interest, penalty and costs.

20.  Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0123

21.  General property taxes for the year(s) 2007 are **delinquent** in the principal amount of $1,372.27, plus interest, penalty and costs.  Tax Parcel No. 45-436-0123

Subsequent delinquency for the year 2008 in the principal amount of $1,388.14, plus interest, penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,107.21, plus interest, penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $916.07, plus interest, penalty and costs.

22.  Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0125

23.  General property taxes for the year(s) 2007 are **delinquent** in the principal amount of $1,372.27, plus interest, penalty and costs.  Tax Parcel No. 45-436-0125

Subsequent delinquency for the year 2008 in the principal amount of $1,388.14, plus interest, penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,107.21, plus interest, penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $916.07, plus interest, penalty and costs.

24.  Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0126

25.  General property taxes for the year(s) 2007 are **delinquent** in the principal amount of $1,412.05, plus interest, penalty and costs.  Tax Parcel No. 45-436-0126

Subsequent delinquency for the year 2008 in the principal amount of $1,428.38, plus interest, penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,128.92, plus interest, penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $962.00, plus interest, penalty and costs.

No. 051-5365579

26.   Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0127

27.   General property taxes for the year(s) 2007 are **delinquent** in the principal amount of
$1,362.33, plus interest, penalty and costs.  Tax Parcel No. 45-436-0127

Subsequent delinquency for the year 2008 in the principal amount of $1,378.08, plus interest,
penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,101.78, plus interest,
penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $903.99, plus interest,
penalty and costs.

28.   Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0128

29.   General property taxes for the year(s) 2007 are **delinquent** in the principal amount of
$1,372.27, plus interest, penalty and costs.  Tax Parcel No. 45-436-0128

Subsequent delinquency for the year 2008 in the principal amount of $1,388.14, plus interest,
penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,107.21, plus interest,
penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $916.07, plus interest,
penalty and costs.

30.   Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0129

31.   General property taxes for the year(s) 2007 are **delinquent** in the principal amount of
$1,461.77, plus interest, penalty and costs.  Tax Parcel No. 45-436-0129

Subsequent delinquency for the year 2008 in the principal amount of $1,478.67, plus interest,
penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,156.06, plus interest,
penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $1,014.78, plus interest,
penalty and costs.

32.   Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0130

33.   General property taxes for the year(s) 2007 are **delinquent** in the principal amount of
$1,352.38, plus interest, penalty and costs.  Tax Parcel No. 45-436-0130

Subsequent delinquency for the year 2008 in the principal amount of $1,368.02, plus interest,
penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,096.36, plus interest,
penalty and costs.

No.  051-5365579

Subsequent delinquency for the year 2010 in the principal amount of $891.62, plus interest, penalty and costs.

34.   Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0133

35.   General property taxes for the year(s) 2007 are **delinquent** in the principal amount of $1,382.22, plus interest, penalty and costs.  Tax Parcel No. 45-436-0133

Subsequent delinquency for the year 2008 in the principal amount of $1,398.20, plus interest, penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,112.64, plus interest, penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $927.91, plus interest, penalty and costs.

36.   Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0134

37.   General property taxes for the year(s) 2007 are **delinquent** in the principal amount of $1,362.33, plus interest, penalty and costs.  Tax Parcel No. 45-436-0134

Subsequent delinquency for the year 2008 in the principal amount of $1,378.08, plus interest, penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,101.78, plus interest, penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $903.99, plus interest, penalty and costs.

38.   Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0135

39.   General property taxes for the year(s) 2007 are **delinquent** in the principal amount of $1,332.50, plus interest, penalty and costs.  Tax Parcel No. 45-436-0135

Subsequent delinquency for the year 2008 in the principal amount of $1,347.91, plus interest, penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,085.50, plus interest, penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $866.01, plus interest, penalty and costs.

40.   Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0139

41.   General property taxes for the year(s) 2007 are **delinquent** in the principal amount of $1,332.50, plus interest, penalty and costs.  Tax Parcel No. 45-436-0139

Subsequent delinquency for the year 2008 in the principal amount of $1,347.91, plus interest, penalty and costs.

No. 051-5365579

Subsequent delinquency for the year 2009 in the principal amount of $1,085.50, plus interest, penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $866.01, plus interest, penalty and costs.

42.     Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0143

43.     General property taxes for the year(s) 2007 are **delinquent** in the principal amount of $1,332.50, plus interest, penalty and costs.  Tax Parcel No. 45-436-0143

Subsequent delinquency for the year 2008 in the principal amount of $1,347.91, plus interest, penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,085.50, plus interest, penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $866.01, plus interest, penalty and costs.

44.     Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0146

45.     General property taxes for the year(s) 2007 are **delinquent** in the principal amount of $1,362.33, plus interest, penalty and costs.  Tax Parcel No. 45-436-0146

Subsequent delinquency for the year 2008 in the principal amount of $1,378.08, plus interest, penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,318.88, plus interest, penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $903.99, plus interest, penalty and costs.

46.     Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0147

47.     General property taxes for the year(s) 2007 are **delinquent** in the principal amount of $1,362.33, plus interest, penalty and costs.  Tax Parcel No. 45-436-0147

Subsequent delinquency for the year 2008 in the principal amount of $1,378.08, plus interest, penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,318.88, plus interest, penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $903.99, plus interest, penalty and costs.

48.     Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0150

49.     General property taxes for the year(s) 2007 are **delinquent** in the principal amount of $1,372.27, plus interest, penalty and costs.  Tax Parcel No. 45-436-0150

No. 051-5365579

Subsequent delinquency for the year 2008 in the principal amount of $1,388.14, plus interest, penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,324.31, plus interest, penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $916.07, plus interest, penalty and costs.

50.    Taxes for the year 2011 now a lien, not yet due. Tax Parcel No. 45-436-0151

51.    General property taxes for the year(s) 2007 are **delinquent** in the principal amount of $1,402.10, plus interest, penalty and costs.  Tax Parcel No. 45-436-0151

Subsequent delinquency for the year 2008 in the principal amount of $1,418.32, plus interest, penalty and costs.

Subsequent delinquency for the year 2009 in the principal amount of $1,340.59, plus interest, penalty and costs.

Subsequent delinquency for the year 2010 in the principal amount of $950.86, plus interest, penalty and costs.

52.    Any charge upon the land by reason of its inclusion in Orem City.

53.    Easements, notes and restrictions as shown on the recorded plat.

54.    Any covenants, conditions, restrictions, easements, assessments, liens, charges, terms and provisions contained within those certain declarations recorded April 04, 2006 as Entry No. 40252:2006 of Official Records, and any amendments thereto, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, or national origin to the extent such covenant, condition or restriction violates 42 USC 3604(c).

Amendment to declarations recorded December 05, 2006 as Entry No. 163768:2006 of Official Records.

55.    Notice of Boundary Adjustment and Certificate Compliance recorded February 22, 2007 as Entry No. 26990:2007 of Official Records.

56.    Certificate Pertaining to Orem City and Vineyard Town recorded March 13, 2007 as Entry No. 36242:2007 of Official Records.

57.    Negative Pledge Agreement by and between HRAF Holdings, LLC, a Utah Limited Liability Company and Bank of America, N.A., a National Banking Association recorded July 30, 2009 as Entry No. 83254:2009 of Official Records.

58.    Notice of Interest in favor of Ivory Homes, LTD recorded May 26, 2010 as Entry No. 43412:2010 of Official Records.

59.    Proceedings pending in the Bankruptcy Court of the U.S. District Court, Utah, entitled in re: HRAF Holdings, LLC and Harbor Real Asset Fund, LP , as Debtor, whose Attorney being Matthew M. Boley, George B. Hofmann, Michael R. Johnson and Steven C. Strong and United States Trustee as Trustee in Case No. 10-32433, wherein a petition for relief was filed on September 09, 2010.

No. 051-5365579

60.   Proceedings pending in the Bankruptcy Court of the U.S. District Court, Utah, entitled in
re: Harbor Real Asset Fund, LP , as Debtor, whose Attorney being Matthew M. Boley, George B.
Hofmann, Michael R. Johnson and Steven C. Strong and United States Trustee as Trustee in Case
No. 10-32436, wherein a petition for relief was filed on September 09, 2010.

\*\*\*

The name(s) Richmond American, HRAF Holdings, LLC and Harbor Real Asset Fund, LP, has/have
been checked for judgments, State and Federal tax liens, and bankruptcies and if any were
found, are disclosed herein.

**NOTE:**      According to the public records, there have been no Deeds conveying the land
described herein within a period of 24 months prior to the date of this Report,
except as follows:  NONE

\*\*\*

Title inquiries should be directed to Leon Lawson @ (801)578-8808.

\*\*\*

**NOTE:**  The policy(ies) to be issued as a result of this Commitment contain an Arbitration Clause set
forth in the Conditions/Conditions and Stipulations Section.  The following is included for the information
of the proposed insured(s):

**Any matter in dispute between you and the company may be subject to arbitration as an
alternative to court action pursuant to the rules of the American Arbitration Association or
other recognized arbitrator, a copy of which is available on request from the company.  Any
decision reached by arbitration shall be binding upon both you and the company.  The
arbitration award may include attorney's fees if allowed by state law and may be entered as
a judgment in any court of proper jurisdiction.**

\*\*\*

**In the event the transaction for which this commitment was ordered "cancels", please refer
to Paragraph B under Schedule B, Section 1 for required cancellation fee.**

\*\*\*

The map attached, if any, may or may not be a survey of the land depicted hereon. First American Title
expressly disclaims any liability for loss or damage which may result from reliance on this map except to
the extent coverage for such loss or damage is expressly provided by the terms and provisions of the title
insurance policy, if any, to which this map is attached.

No. 051-5365579



No. 051-5365579

**CONDITIONS**

1. **DEFINITIONS**
   (a) "Mortgage" means mortgage, deed of trust or other security instrument.
   (b) "Public Records" means title records that give constructive notice of matters affecting the title according to the state law where the land is located.

2. **LATER DEFECTS**
   The Exceptions in Schedule B may be amended to show any defects, liens or encumbrances that appear for the first time in the public records or are created or attached between the Commitment Date and the date on which all of the Requirements are met. We shall have no liability to you because of this amendment.

3. **EXISTING DEFECTS**
   If any defects, liens or encumbrances existing at Commitment Date are not shown in Schedule B, we may amend Schedule B to show them. If we do amend Schedule B to show these defects, liens or encumbrances, we shall be liable to you according to Paragraph 4 below unless you knew of this information and did not tell us about it in writing.

4. **LIMITATION OF OUR LIABILITY**
   Our only obligation is to issue to you the Policy referred to in this Commitment, when you have met its Requirements. If we have any liability to you for any loss you incur because of an error in this Commitment, our liability will be limited to your actual loss caused by your relying this Commitment when you acted in good faith to:

   comply with the Requirements
   or
   eliminate with our written consent any Exceptions shown in Schedule B

   We shall not be liable for more than the Amount shown in Schedule A of this Commitment and our liability is subject to the terms of the Policy form to be issued to you.

5. **CLAIMS MUST BE BASED ON THIS COMMITMENT**
   Any claims, whether or not based on negligence, which you may have against us concerning the title to the land must be based on this Commitment and is subject to its terms

No.  051-5365579



## First American Title Insurance Company

## PRIVACY POLICY

**We Are Committed to Safeguarding Customer Information**

In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information - particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, together with our parent company, The First American Corporation, we have adopted this Privacy Policy to govern the use and handling of your personal information.

**Applicability**

This Privacy Policy governs our use of the information which you provide to us. It does not govern the manner in which we may use information we have obtained from any other source, such as information obtained from public records or from another person or entity. First American has also adopted broader guidelines that govern our use of personal information regardless of its source. First American calls these guidelines its *Fair Information Values*, a copy of which can be found on our web site at www.firstam.com.

**Types of Information**

Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:

- Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;
- Information about your transactions with us, our affiliated companies, or others; and
- Information we receive from a consumer reporting agency.

**Use of Information**

We request information from you for our own legitimate business purposes and not for the benefit of any nonaffiliated party. Therefore, we will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. We may also provide all of the types of nonpublic personal information listed above to one or more of our affiliated companies. Such affiliated companies include financial services providers, such as title insurers, property and casualty insurers, and trust and investment advisory companies, or companies involved in real estate services, such as appraisal companies, home warranty companies, and escrow companies. Furthermore, we may also provide all information we collect, as described above, to companies that perform marketing services on our behalf, on behalf of our affiliated companies, or to other financial institutions with whom we or our affiliated companies have joint marketing agreements.

**Former Customers**

Even if you are no longer our customer, our Privacy Policy will continue to apply.

**Confidentiality and Security**

We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products and services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's *Fair Information Values*. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

c2001 The First American Corporation - All Rights Reserved